1

**SAMINI BARIC KATZ LLP**

2

Bobby Samini, Esq. (SBN 181796)

Michael Katz, Esq. (SBN 181728)

3

Steve Baric, Esq. (SBN 200066)

4

John S. Oney IV, Esq. (SBN 338596)

650 Town Center Drive, Suite 1500

5

Costa Mesa, CA 92626

6

Telephone: (949) 724-0900

7

Fax: (949) 724-0901

Email: bobby.samini@sbklawyers.com

8

Email: michael.katz@sbklawyers.com

9

Email: steve.baric@sbklawyers.com

Email: john.oney@sbklawyers.com

10

11

*Attorneys for Plaintiffs Salud Gonzalez,*

12

*Darleen Diaz, Bernice Perez, Ashley Ruiz,*

*and Elena Peltola*

13

**UNITED STATES DISTRICT COURT**

14

**CENTRAL DISTRICT OF CALIFORNIA**

15

16

SALUD GONZALEZ, an individual,

DARLEEN DIAZ, an individual,

17

BERNICE PEREZ, an individual,

18

ASHLEY RUIZ, an individual, and

ELENA PELTOLA, an individual,

19

20

Plaintiffs,

21

v.

22

INTERNATIONAL CHURCHES OF

23

CHRIST, INC., a California nonprofit

corporation; THE INTERNATIONAL

24

CHRISTIAN CHURCH, INC., a

California nonprofit corporation; HOPE

25

WORLDWIDE, LTD., a Delaware

nonprofit corporation;

26

MERCYWORLDWIDE, a California

nonprofit corporation; CITY OF

27

ANGELS INTERNATIONAL

CHRISTIAN CHURCH, a California

28

Case No. 22-09467

**COMPLAINT FOR:**

1. **SEXUAL ASSAULT OF A MINOR**
2. **VIOLATION OF PENAL CODE 647.6(A)(1)**
3. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
4. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**
5. **NEGLIGENT SUPERVISION OF A MINOR**
6. **FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY**
7. **NEGLIGENCE**

1  nonprofit corporation; THOMAS
2  ("KIP") McKEAN, an individual; THE
3  ESTATE OF CHARLES "CHUCK"
   LUCAS; and DOES 1 through 100,
4  inclusive,

5          Defendants.
6
7
8
9
10

**8.  VIOLATION OF FEDERAL
     RACKETEER INFLUENCED
     AND CORRUPT
     ORGANIZATION ("RICO")
     ACT 18 U.S.C. § 1962(C)
9.  SEXUAL BATTERY IN
     VIOLATION OF CAL. CIV.
     CODE § 1708.5
10.  GENDER VIOLENCE IN
     VIOLATION OF CAL. CIV.
     CODE § 52.4**

**JURY TRIAL DEMANDED**

11
12
13
14
15                **[REMAINDER PAGE INTENTIONALLY LEFT BLANK]**
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30

Plaintiffs SALUD GONZALEZ, DARLEEN DIAZ, BERNICE PEREZ, ASHLEY RUIZ, AND ELENA PELTOLA (collectively, "Plaintiffs") hereby submit this Complaint pursuant 18 U.S.C. §§ 1961 *et. seq.*, the California Civil Code and the California Penal Code, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THE INTERNATIONAL CHRISTIAN CHURCH, INC., HOPE WORLDWIDE, LTD., MERCYWORLDWIDE, CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH, THOMAS "KIP" McKEAN and THE ESTATE OF CHARLES "CHUCK" LUCAS, and all other named and unnamed defendants (collectively "Defendants") and states as follows:

## INTRODUCTION

1.     This action to recover damages on behalf of adult victims of childhood sexual assault is governed by Code of Civil Procedure section 340.01 ("section 340.01").

2.     The incidents of childhood sexual assault against Plaintiffs alleged herein were facilitated and actively concealed by Defendants while Plaintiffs were minors.

3.     This case involves an **ongoing and systemic scheme of abuse that shocks the conscience from its appallingly epic proportions** that has been effectuated and actively concealed by a **ruthless den of sexual predators** wherein, through physical force and psychological manipulation, **children as young as 3 years old were repeatedly raped and sexually abused with impunity by trusted church members**.

## JURISDICTION AND VENUE

4.     This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

5.     Pursuant to Code of Civil Procedure §340.1(q) as amended by Assembly Bill 218, effective January 1, 2020, there is a three (3) year window in which all civil claims of childhood sexual assault are revived if they have not been litigated to finality. This provision provides that, "[n]otwithstanding any other provision of law, any claim

for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020. A plaintiff shall have the later of the three-year time period under this subdivision or the time period under subdivision (a) as amended by the act that added this subdivision." This claim has not been previously litigated to finality; thus, it is timely under the revised provisions of Code of Civil Procedure §340.l(q).

6.     This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve centers" of the International Churches of Christ, Inc., and The International Christian Church, Inc. are both within the jurisdictional boundaries of the Central District of California.

## THE PARTIES

### A. PLAINTIFFS

8.     Plaintiff Darleen Diaz ("Plaintiff Darleen" or "Darleen") is a citizen and resident of Los Angeles, California. Plaintiff Darleen was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

9.     Plaintiff Bernice Diaz ("Plaintiff Bernice" or "Bernice") is a citizen and resident of Los Angeles, California. Plaintiff Bernice was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

10.     Plaintiff Ashley Ruiz ("Plaintiff Ashley" or "Ashley") is a citizen and

resident of Los Angeles, California. Plaintiff Ashley was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

11.     Plaintiff Salud Gonzalez ("Plaintiff Salud" or "Salud") is a citizen and resident of the State of Oregon. Plaintiff Salud was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

## B. DEFENDANTS

12.     Defendant International Churches of Christ, Inc. (the "ICOC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

13.     Defendant The International Christian Church, Inc. ("ICC") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. ICC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. ICC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

14.     Defendant HOPE worldwide ("HOPE") was founded in 1994 by the ICOC and is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of Delaware, with a principal place of business registered with the Secretary of State for the State of California located at 9449 Balboa Ave. Ste.

311, San Diego, California 92117. HOPE purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California.

15.     Defendant MERCYWorldwide ("MERCY") was founded in 2009 by the ICC as a domestic nonprofit corporation and registered with the California Secretary of State as a California corporation. Both the ICC and MERCY listed its principal address at the same address: 2305 30th Street, Santa Monica, California. MERCY purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. MERCY is partially owned by ICC and the principal source of funding for all administrative costs is the ICC.

16.     Defendant City of Angels - International Christian Church ("City of Angels") is a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California. City of Angels purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles, State of California. City of Angels has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide.  This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

17.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.  Defendant Kip's supervision, direction, and control over the  Defendants forms the basis of his personal liability.

18.     Defendant The Estate of Charles "Chuck" Lucas ("Chuck" or "Lucas"), upon information and belief,   was a citizen of the United States of America and was residing, at the time of his death, in Thomasville, Georgia. At all times relevant to the

events that form the basis of this Complaint, Defendant Chuck was a member of the ICOC, and later, formed another church called Cornerstone. Defendant Chuck resided in Georgia for extended periods while conducting business in California on behalf of Defendant ICOC.  Defendant Chuck's supervision, direction, and control over the Defendants forms the basis of his personal liability.

19.    Plaintiffs are ignorant of the true names of the defendants sued herein as Does 1-100, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will amend the Complaint to allege their true names when ascertained. Plaintiffs allege that, at all relevant times herein, Does 1-100 were the co-conspirators, subsidiaries, employees, employers, and agents of constituent members of Defendants herein. Plaintiffs allege that each of the fictitiously named defendants is legally responsible for the actions forming the basis of this Complaint and that Plaintiffs' losses and damages are the result of their wrongful conduct.

## GENERAL ALLEGATIONS

**Introduction to ICOC and ICC's Meticulously Crafted Abuse Enterprise**

20.    The  Defendants, at the direction and control of McKean and Lucas, have collectively exploited everything good and noble in their trusting and loyal members by callously robbing them of their childhood innocence through: **psychological coercion and manipulation; pervasive sexual abuse of children as young as 3 years old; and shameful financial abuse**. Each of the foregoing abuses were actively concealed by the  Defendants to avert discovery by child protective services and the police.

21.    Founded in 1993, ICOC has become an intricate and intentionally confusing "network of over 700 non-denominational churches in about 150 countries." Throughout its history, ICOC has gone by other names, such as: the Boston Movement, the Discipling Movement, the Crossroads Movement, and Multiplying Ministries, for example. Often, the city in which a local assembly is located is added to the name, for example, Milwaukee Church of Christ and Sarajevo Church of Christ."

22.    To ensure the Defendants' exploitative conduct remains unchecked,

1   Defendants have utilized their vast resources to **silence any internal dissidents**
2   **through physical and sexual violence**, and if necessary, vexatious litigation.

3        23.    Defendants have created a "David and Goliath" scenario, where the few
4   members that have spoken up over the last four decades, have been swiftly
5   suppressed. Defendants have intentionally created a system of exploitation that is
6   extracts any and all value it can from members and non-members while shielding
7   their illicit conduct from discovery by outsiders.

8        24.    Defendants coerced parents/members to remain silent regarding the
9   abuses their children suffered through payoffs and non-disclosure agreements. It is the
10  vast financial base that has insulated the  Defendants from exposure, and provides
11  legitimacy and license to  Defendants' system of exploitation and abuse. The
12  communal ostracization and isolation from the outside world has caused highly
13  debilitating emotional and mental harm, and in some cases, suicide.

14       25.    The Defendants operate with a strict and documented **discipleship**
15  **pyramid**, where every member has an elder disciple member "over them" that acts as
16  a sort of mentor and jailor. This carefully crafted infrastructure enables both churches
17  to execute and maintain a **micromanaged degree of control over every aspect of**
18  **every member's life**. Members are systematically deindividualized, only to endure
19  communal isolation from the world at large.

20       26.    Only these "disciplers" were allowed to provide any counseling to
21  church members, however, they were not licensed counselors or mental health
22  practitioners. Abuse victims were routinely branded as "disobedient" or
23  "independent" and blamed for whatever abuse was happening. Such occurrences are
24  common in the ICOC/ICC.

25       27.    Abuses were reported to the "disciplers", however, no investigations
26  were initiated and no reports were made to the police by any named Defendant.

27       28.    The  Defendants created a religious requirement that required victims to
28  confess "sins" on a daily basis, however, "disciplers" would share the specifics of
29  these "sins" with other groups and leaders in a gossip-like culture. This allowed
30  McKean and the  Defendants to use the abuse as emotional blackmail within the

community.

29.     In addition to the "discipler" structure, the  Defendants were/are characterized by **indoctrination of rigid fundamentalist teachings, unyielding compliance with instruction and strict social separatism**.  Every new member undergoes a rigid conversion process that is tantamount to systemic brainwashing, called the "First Principles" and once a new member agrees to all indoctrination related teachings, they must be baptized in water and commit to devote their entire life and schedule to the church.

30.     Members are/were also required to give at least 10-30% of their income to the churches before they are allowed to be baptized and become an official member.

31.     The  Defendants teach their members that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife; non-members will not go to heaven and are not "true disciples" of Jesus. Indeed, this **insider-outsider dichotomy** allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution. ICOC and ICC created a **highly exclusive environment for its members** wherein they were/are prohibited from marrying anyone outside the church and the church must approve all marriages, which ultimately gives the church an incredible degree of control over every aspect of its members lives.

32.     The  Defendants' hierarchical system of authority facilitates the ongoing physical and sexual abuse of children by insulating predatory church leaders from exposure. The  Defendants' predators continue preying upon children without fear of repercussion.

33.     Parishioners are required to forgive any slight, no matter how severe, and "move on" without reporting such abuses. The  Defendants teach that because "no one is free from sin," judging the conduct of another, no matter how villainous, is beyond the right of any individual. Further, parishioners must protect God's church and modern-day movement from all challenges.

/ / /

-9-

**Church History**

34.    Founded in Boston in 1979 under the "Boston Movement" moniker by Thomas "Kip"  McKean ("Thomas McKean" or "Kip") (and 29 other members) through secession from the Church of Christ in Gainesville, Florida. The fledgling "church" quickly sought new members upon formation and enjoyed considerable expansion and success. After the Boston Movement obtained religious and corporate recognition as the International Church of Christ in the 1980's, the ICOC swiftly grew into a multinational movement. According to the ICOC's self-reported statistics, the ICOC is a body of approximately 700 cooperating Christian non-denominational congregations spread across 144 nations, with more than 120,000 members worldwide.

35.    In 1979, the Church of Christ that helped spawn ICOC and eventually ICC, was jointly led by Charles Howard Lucas ("Chuck" or "Chuck Lucas"), a licensed psychologist at the time, and McKean. It is commonly understood that **McKean, was acutely aware of, the physical, psychological, and sexual abuses Lucas and other church members wrought upon both children and adult parishioners of the church**. Academic writings, journals, recovered correspondence, newspaper articles, eyewitness accounts, and publications like the book, "Toxic Christianity," which was written by former ICOC leading members under the pseudonym "Mr. X".[1] These are but a fraction of the litany of information depicting the practices and abuses that the  Defendants have institutionalized to the point of normalcy within the church.[2]

36.    ICOC was incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to…the individual congregations that are part of the worldwide fellowship of churches of Christ (which

---

[1] Toxic Christianity. It's widely believed that Rick Bauer co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

[2] Writings from former members and ICOC leaders, in addition to information about the ICOC/ICC churches organizational structure, religious dogma, and their associated analyses can be found at http://www.reveal.org/library/psych/stumpk.html

are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

37.     The International Christian Church (ICC) was founded by Kip McKean in 2006 after he was forced out of ICOC. ICC was registered in California as a nonprofit religious corporation in October 2006, and as of December 2022, ICC listed 104 affiliate churches on its website. Articles of Incorporation filed by ICC with the California Secretary of State included references to affiliates of ICC. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated with the International Christian Church.[34]

38.     The  Defendants are independently operating a highly profitable pyramid scheme supported by a web of paper corporations and sham 501(c)(3) entities, culminating in hundreds of millions of dollars in illicit gains. The full extent of ICOC and ICC's profiteering is unknown, especially given the tithing and labor contributions ICOC and ICC routinely coerce from their members.

39.     Plaintiffs are aware that ICOC and ICC have also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[5] Through their veiled abuse of the corporate form and systematic exploitation of their members, the ICOC/ICC has created a literal cash cow built upon layers of lies and deceit.

40.     One example of a tax-exempt corporation under the ICOC/ICC corporate

---

[3] Between April 2020 and February 2021, 18 branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

[4] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it's "organized into eight self-supported regions. Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as helping one another mature in Christ." Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

[5] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. (projects.propublica.org, accessed December 15, 2022; disciplestoday.org, accessed December 15, 2022)

umbrella is the sham charity organization Defendant HOPE, which has generated over $100 million in revenue over the last six years. HOPE generates a substantial share of its tax-free revenue from its members using substantially similar methods of ICOC and ICC, which are characterized by the tax-deductible contributions from third-party corporations and high-net-worth individuals.

41.    Chuck and McKean co-designed the discipling pyramid that would later become the foundational structure that formed the mechanism of control and coercion frequently used by the Defendants.

42.    Chuck Lucas was leading the CrossRoads Church of Christ in Gainesville, Florida, before he was paid off to leave Florida and start another church, with the explicit goal that Chuck would no longer be associated with the ICOC because of his deviant behavior. ICOC and McKean strategically downplayed Chuck's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, these "recurring sins" were never investigated by ICOC.[6] The Defendants, McKean and other church leaders were acutely aware of Chuck's disturbing pattern of abuse, but nevertheless actively concealed Chuck's misdeeds to avert discovery by the police.

43.    Notwithstanding his reprehensible history of abusing church members, in or about 1986, Chuck was paid to sever ties with ICOC, leading him to start a new church in Tallahassee/Gainsville Florida, which he named Cornerstone. Chuck died in August 2018, however, Plaintiffs herein witnessed his ongoing abuse of children and adults within the congregation through the end of his despicable life.

44.    Sam Laing, one of Chuck's continued faithful supporters and a prominent lead evangelist with the ICOC, was well aware of Chuck's deeply disturbing abuses and its chronology. Sam Laing recently made a statement about Chuck in a 2018 article published in "Disciples Today," which is an ICOC owned platform/news source:

---

[6] History Repeats Itself: The Rise and Fall of Kip McKean & Chuck Lucas. Ryan Britt. 2002. Accessed on December 29, 2022 at http://www.reveal.org/library/history/britt2.html

**"Chuck Lucas was a man of deep conviction. He was a disciple of great courage and perseverance. He was criticized, persecuted and attacked for what he stood for, but he never quit. Yes, he had his weaknesses and failures along the way, but he, by grace, repented and overcame them, and was restored."[7]**

**Kip McKean Forms ICC, A Carbon Copy of ICOC, to Continue the Abuse Enterprise**

45.     In or about 2003, Mr. McKean formally split from ICOC after an uprising and various op ed public letters were published by ICOC leaders. He officially formed ICC in or about 2006. ICC encompassed the same guiding principles and culture as ICOC. **ICC was a carbon copy of ICOC, however, ICC eventually eclipsed ICOC in terms of the mania, secrecy and abuse that occurred**. From its inception, the ICC became a much more effective tool of mass exploitation, best explained by the fact that Mr. McKean vowed to learn from any past incidents of dissent or divisiveness in the ICOC, to make sure that these uprisings or challenges to his authority never happened in his new "movement of God".

46.     McKean currently oversees ICC operations from its Los Angeles headquarters and he has completely separated himself from ICOC because he believes the entire ICOC congregation is  now lost, likely because he is not the person currently leading it. ICC's current membership is believed to include approximately 7,000 individuals.

47.     A former leader of ICC, Coltin Rohn, oversaw the Columbus, OH ICC congregation and was **fired for publicly voicing concerns surrounding child exploitation**. Coltin was a full-time evangelist with the ICC but was immediately fired for criticizing the church's tactic of bullying members to give a specific amount of money to the church. Coltin was deeply concerned about the church's practice of

---

[7] Chuck Lucas: A Servant of God. Sam Laing. 2018. Accessed on December 29, 2022.
https://www.dtodayarchive2.org/chuck-lucas-gods-servant-and-how-he-used-him

COMPLAINT

1   threatening a member's salvation and standing within the community if they did not

2   give 10-40% of their annual income to the church.[8]

3       48.    On or about December 24, 2022, Coltin became aware of an ICC letter,

4   sent out to every single person in their ICC church, showing the process of "marking"

5   Coltin and his wife.

6       49.    The  Defendants have continued to threaten anyone who speaks out

7   against the church with vexatious legal actions, disfellowship, and/or "marking."

8   **"Discipling" Structure is the Foundation of the  Defendants' System of**

9   **Psychological Enslavement**

10      50.    ICOC was born from a "discipling" movement that arose among the

11  Churches of Christ during the 1970's and the church has maintained this practice in

12  present times. This is a strict practice involving a "discipleship hierarchy" where a

13  formal discipleship tree or a top-down authoritarian hierarchy was formed.

14      51.    The hierarchy assigned every member a specific & strategic discipleship

15  partner, who would oversee the other member. The "disciplining" movement has been

16  memorialized in writing by Flavlil R Yeakley Jr. in a book titled "The Discipling

17  Dilemma". The **rigid and pervasive culture of fear, coercion, control,**

18  **manipulation, judgment, exclusion, punishment**, along with the church's overt

19  focus on membership growth (i.e., its primary source of income), have resulted in a

20  **widely accepted categorization of ICOC and ICC as toxic, destructive cults**.

21      52.    This "discipleship tree" was nothing short of a sophisticated scheme,

22  deeply rooted in **psychological manipulation** scheme by **institutionally normalizing**

23  **the use of aggressive, abusive, and coercive tactics** that brainwash members into

24  fearing the loss of salvation for menial transgressions.

25      53.    Any member's position, health, and wellbeing depend heavily upon

26  success in expanding the congregational rosters. The Defendants' leadership created a

27  self-perpetuating business model to attract new recruits/members, and in doing so,

28

29  [8] The New York Daily News stated that "dozens" of former members of ICOC "call it a destructive sect that is more
    concerned with drawing in new members and draining their money than in matters of faith."  One ex-member of ICOC
30  described ICOC as a "pyramid scheme" in which members "were all giving 10% to 40% of our income."

1    generate hundreds of millions of dollars in revenue for the church.

2        54.    An illustration of the Defendants' hierarchical model of authority is

3    depicted below:

> The ICC had a complex and highly hierarchical organizational structure, unusually so for a
> relatively new and small religious group. There are many layers of leadership, similar to a
> pyramid or the Roman Catholic Church.



> The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip
> McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as
> *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

55.    McKean, along with other ICOC leaders were obsessed with growing church membership and, therefore, **imposed recruiting quotas on members**. All members were required to attempt to recruit a certain number of new members each day and members were also required to bring visitors to all church events. ICOC imposed quotas for everything imaginable. **Members were isolated from outsiders and the church cultivated an atmosphere that actively promoted and concealed the systemic abuse of women and children within the church**. Members were together every day and they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to this strict rule is that members could contact outsiders for the sole purpose of

-15-

recruitment.

56.     The Defendants' members were forced to tithe and give at least 10% of their gross income to the church *and* participate in special contributions for missions approximately twice a year equaling approximately **40 times their normal tithe amount**. The ICOC was relentless in its pursuit for funding and church leadership would resort to **interrogating members about their income**, going so far as to **demand copies of the members' paystubs**. By way of example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This particular member would be required to give the church a whopping total of $208,000 for the year!

57.     If the tithing budget was not satisfied, leaders or "disciplers" were forced to contribute the financial shortfall themselves, or members were required to locate the offending member who failed to tithe and sit on their porch until they arrived home in an attempt to obtain their tithe funds before Sunday evening was over. The pressure to comply with the church's rigid demands was a source of anxiety and depression for many members. So much so that **several ex-members committed suicide**.

58.     In 2005, two former ICOC members filed a suit in Tennessee "claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions." They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

59.     A former member named Tina witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore accounts

containing massive quantities of cash.[9]

**Defendants' Members Are Systematically Indoctrinated, Brain Washed and Manipulated**

60.     Initially, early recruits received profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to effectively manipulate them and eventually abuse them with the comfort of knowing these vulnerable and newly brainwashed people would never report the abuse.

61.     Each member is trained to understand, which they come to wholeheartedly believe that in connection with the church, **"compliance was the path of least resistance."** These members genuinely and wholeheartedly believed they needed to follow the Bible verbatim and **the Defendants, including their leadership, were the only "true" modern-day disciples on Earth**.

62.     Church members were a dynamic and diverse group, consisting of scores of successful individuals such as doctors, lawyers, professional athletes, actors, teachers, business owners, PhDs, and **a remarkable number of leaders possessed psychology degrees**.

63.     It is without doubt that their education and training enabled these members to psychologically deplete members and manipulate children and their parents into submission, which created fertile ground for heinous sexual and physical abuse to thrive.

64.     One psychologist ICOC member currently owns a school for autistic children in the San Francisco area and he has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but **McKean**

---

[9] Top leaders of the ICOC put "different ICOC assets and properties in their names" in order shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under an "other" exemption.  The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

**orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution**.

65.     McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following is a rough depiction of the church's organizational structure:



66.     The Defendants' structure was purposefully structured in this manner to, among other things, **ensure the abuse within the church remained a secret to all outsiders**, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

67.     Questioning higher ranking members or the church in any manner was frowned upon. Some individuals were "disfellowshipped" or "marked" for being divisive if they asked too many questions, or questioned any leaders. A member with either of these labels were **fiercely ostracized by the entire membership, including their families**. "Disfellowshipped" members are essentially excommunicated and shunned from the Defendants' communities. Accordingly, being labeled as "disfellowshipped" or "marked" equated to hell on earth and in the afterlife for any

member so labeled.

**McKean and the Defendants Preyed Upon and Defrauded College Students**

68.     The Defendants have increasingly focused on **recruiting college students**. By utilizing college campuses across the globe as its primary hunting grounds, they are more successful at grooming new members but have an opportunity at pecuniary gain by convincing them to pay for a worthless education.

69.     The practice of preying upon college students resulted in numerous televised exposés in the mid-1990's when the ICOC cult commanded larger numbers, including but not limited to: 20/20 with Barbara Walters, Inside Edition, Fox News, BBC, and MTV.

70.     These news stories were explosive and highly negative representations of the church, as many parents were crying out to the media for help because their college aged children were being brainwashed by a cult. Some parents expressed that they felt like their children were kidnapped by ICOC.

71.     Indeed, ICOC and ICC's exploitation of college students ultimately resulted in the ICOC\ICC being **banned from on-campus recruiting from several schools across the nation**, including but not limited to Boston University, which is situated near the epicenter of the ICOC. Surprisingly, the exposés did not garner enough outrage among the general population, leaving the ICOC\ICC to continue to prey upon college students without repercussion. Until now, the ICOC has had the luxury of the benefits from their long-time obfuscation of their parasitic internal practices.

**ICOC and ICC Actively Concealed Child Abuse, Including the Forcible Rape of a 3-year-old Girl**

72.     Mr. McKean is so brazen that he **publicly admitted to defrauding students** by handing out unearned, illegitimate, and meritless doctoral degrees designed to both inflate the importance of its senior members and extract unearned pecuniary gains.

> "The ICC runs an unaccredited college, called the
> International College of Christian Ministries, or ICCM,

where they are handing out doctorates to anyone they choose, where the established course work is limited only to literature/books created within the ICC. This is why most leaders in the ICC put the abbreviation of "Dr" in front of their names, because they have been giving each other unaccredited doctorate status. The ICCM has already brought in approximately $6 million through ICC members attending this unaccredited college."

*"During Covid, while the (financial) giving inside most religious organizations declined, our giving inside of God's Sold-Out Modern-Day Movement steadily increased! Due to our disciples receiving $3000 each in stimulus checks, and approximately $6000 total per couple, these members turned over that stimulus money to the church. As a matter of fact, the sold-out ICC Disciples are now giving $250K every single WEEK!"[10]*

*"In addition to this money, and according to God's promise of always taking care of his people, the Sold-Out movement was further blessed by the government providing SBA loans to our members. Therefore, we were able to bring in $1.2 million of SBA loans to God's sold-out movement. We in turn used this SBA loan money to start 22 churches around the world. Isn't that incredible!! To God be the glory!"*

**McKean and the  Defendants Actively Concealed the Rape of Children as Young as 3 Years Old**

73.     The active concealment of systemic abuse within the  Defendants by a **den of "religious" sexual predators**, i.e., church leaders such as Mr. McKean and Mr. Lucas, were the impetus of a devious and rampant culture of psychological abuse and manipulation, willfully ignoring the pervasive sexual abuse of children and adults throughout the churches and actively concealing abuse from the authorities.

74.     In furtherance of efforts to protect the church and its primary source of revenue (its members) at all costs, the  Defendants attempted to cover up these disgraceful crimes by manipulating members with remarks from McKean such as:

---

[10] Currently, the sold-out ICC Disciples are now giving approximately $360K per week.

> *"We cannot report these abuses, because it would hurt*
> *our church, which is God's Modern-Day Movement."*
> *"Do you want the fall of God's modern-day movement*
> *on your head???!!"*
> *"The cause of protecting God's Kingdom on earth is*
> *more important than the sin or the pain of a few*
> *individuals."*
> *"We need to forgive our brothers who sin, and realize*
> *that they are a new creation in Christ, and give them a*
> *chance to make things right. If we report them, it will*
> *destroy their lives and hurt the church."*

75.     In addition, the church engaged in strategic victim blaming and victim shaming. For example, **young children who were abused were later blamed for that abuse when the ICOC would assert how their clothing was "too provocative"**.

**McKean and the  Defendants Drugged Young Children into Submission and Silence**

76.     The  Defendants did not stop with physical, psychological, and financial exploitation. Many children were administered medication by church affiliated "doctors," such as Anthony Stowers and Dr. Kris Stowers. Often, the affiliate doctors would administer medications that were prescribed for other conditions or children received medication for conditions for which they were never diagnosed. To conceal their illegal conduct and minimize scrutiny, the  Defendants' **doctors provided the children with medication in unmarked bottles**.

77.     One of these affiliate physicians is a **staff doctor at Florida State University** and another that has administered medications to children for mental illness despite lacking any qualification to do so medically or through public license, is an **orthopedic surgeon for athletes**.

78.     **Drugging children has also facilitated the ICOC's clandestine efforts to conceal the ongoing child abuse from anyone outside the church**. The children were persuaded to believe, through strategic pharmacological deception and psychological manipulation, that they were never abused and if their own memories seem contradictory, then their memories are flawed.

/ / /

**McKean and the Defendants Used Children's Ministries to Effectuate the Abuse Enterprise**

79.     The children's ministry was named the **"Kids Kingdom", which served as a demented playground for the sexual predators within the Defendants**. Countless instances of abuse happened within the Kids Kingdom, as the program hosted mission trips (HOPE Worldwide), social events and the children frequently visited members' homes.

80.     Defendant HOPE Worldwide is ICOC's benevolent arm wherein teenagers took mission trips around the world to spread God's Word. Many of these children who were participating in what they believed to be an evangelical trip, were ultimately sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (i.e., mandated reporters) within the church, however, the church never bothered notifying the police of the illegal activity. **There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church**.

**McKean and the Defendants Encouraged Physical Abuse of Children Under the Guise of Discipline**

81.     In addition to sexual abuse, ICOC and ICC children were routinely physically abused under the pretext of "discipline". Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

82.   For example, members were instructed to **spank children, including infants, with a wooden paddle, custom made with a heart shaped hole in it, to create a more aerodynamic and effective (painful) spanking device**. A true and correct image of the heart shaped paddle is depicted  below:



83.   Members were instructed, with visuals, how to **use corporal punishment without leaving bruises, welts or red marks, so the offending members could not be reported to child protective services**. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

**1.2 Million People Leave ICOC After Abuses were Exposed**

84.   Since at least 1979, ICOC and ICC have averted authority suspicion notwithstanding the fact that in excess of the last 40 years, **predatory members have escaped prosecution for countless instances of sexual abuse (children and adults),**

**physical abuse (adults and children), spousal abuse, and emotional abuse**.

85.     Mr. McKean and his team of capable, well-educated henchmen convinced nearly everyone within the churches to remain silent for the last 43 years. That silence has come to an end.

86.     Many ICOC members were fortunate enough to escape the church's tight grasp and successfully flee the toxic and harmful environment that Mr. McKean created.

87.     From its inception in 1979 to the present, approximately **1,200,000 souls defected from ICOC**. The large number of defectors is due, in large part, to the explosive growth that ICOC experienced.

88.     For three consecutive years, the ICOC was labeled in the religious world as the **fastest growing church on the planet**. Simply put, ICOC's growth was nothing short of profound. On the other hand, its bleeding was also profound, because members defected in record numbers as they became increasingly aware of the heinous, pervasive abuse of children and adults and the corresponding cover ups. These courageous souls would simply disappear, never again to be seen by anyone in the church.

89.     According to some of the most respected cult experts around the world, including but not limited to Dr. Steve Hassan PhD, the  Defendants are some of the most dangerous cults in existence. This is primarily because of the church's insidious tactic of masquerading as the Christian church next-door with deeply rooted Biblical foundation. On its face, this public image of the church seems innocent and believable, however, **the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and women within the church**.

90.     Defectors have since revealed the abuse they suffered and/or witnessed at ICOC and ICC. Former member Lisa Johnson who as a top leader in New York City and also a friend of Mr. McKean, in a podcast called "Eavesdropping" made the following comments regarding the church, based on her personal experience: — I'll close out with two soundbites from video evidence. The first one is by Lisa Johnson

from a recent episode of her podcast called "eavesdropping."

> *"Women (in the ICOC) are getting ground up, and I mean tons of people, it's not an isolated case here and there….And I think about these women now, after all these years…*
>
> *So I'm gonna bring up something here…*
>
> *…The sexual abuse….there has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women… and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women….There are women that have been very damaged and ground up by that.*
>
> *The fruit of this is so obvious, how can you miss it?! How many women have been told to stay with their physically abusive husbands and how many women have been sexually abused?!"*

## ICOC and ICC Refused to Report Pedophiles Who Were Later Arrested

91.    Several pedophiles have been arrested in connection with various abuses. These individuals committed numerous crimes before the police intervened and are a miniscule representation of the true number of predators who have operated with impunity within the church since 1979.

92.    In January 2012, David Iburg, aka David Saracino ("Mr. Saracino" or "David Saracino") was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for **forcible rape upon a 4-year-old girl in 2004**.[11] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst. Mr. Saracino purposefully sought out women with financial problems so he could gain access to their small children, who became his victims. He had charges and convictions in Texas, Utah and Louisiana, where he received the 40-year sentence.

---

[11] *State v. Iburg*, 12-2720 (La. 5/17/13), 118 So.3d 372

93.     David attended the East Region of the LA ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East Region in or about 1998 that David Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports while David escaped to the San Diego ICOC and freely resided in the Escondido area temporarily Like so many others, these mothers were told not to share with anyone else what David had done, as it would "hurt the church." David ultimately disappeared uncaptured. David was free to go on a nationwide crime spree, abusing and raping little girls along the way. David was finally caught, but only an episode of America's Most Wanted produced credible leads that resulted in his capture. Had ICOC assisted in his arrest or alerted their congregations, David Saracino could not have continued abusing children with reckless abandon. ICOC's commitment to abject apathy is sickening and clearly intentional.

94.     In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey was arrested on charges of possession and distribution of child pornography. Mr. Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

95.     In 2005, Benjamin Samuel Speights, a member of the south region of the LA ICOC, was convicted for lewd and lascivious acts against a child under the age of 15. Mr. Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

96.     In December 2020 Mr. Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges. Mr. Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC. Several children at this ministry reported his physical abuse.

97.     Without a doubt, Mr. Speights has a sordid and despicable history of abusing children.

98.     Consistent with their historic complicity, the  Defendants never reported

1    the abuse these children endured or attempted to prevent future abuses.

2        99.    Nicholas Griffin Lombardi ("Mr. Lombardi") is another example of a

3    known pedophile abusing children within the  Defendants' churches. He was a long-

4    standing member of the ICOC, as were his parents.

5        100.   On or about November 27, 2022, as a clear demonstration of kind of

6    monster Mr. Lombardiis, Mr. Lombardi posted on his personal Facebook page "I kind

7    of have a fantasy of fucking a child ha[.]"

8        101.   Mr. Lombardi was convicted for lewd and lascivious acts against a child

9    under the age 15. In addition, there are numerous accusations of abuse against Mr.

10   Lombardi, however, the  Defendants refused to report his abusive conduct to the

11   authorities, and he remains free to continue abusing children with impunity.

12                          **SPECIFIC ALLEGATIONS**

13   **The Childhood Abuse of Plaintiff Bernice Perez**

14       102.   Bernice Diaz was born in November of 1991 in California.  In the mid

15   90's Bernice's mother, Deziree Diaz ("Deziree") was invited to the East Region of the

16   ICOC by her sister, a who was an active member at the time.  Deziree, Bernice and

17   Darleen, Deziree's oldest daughter, began attending the East Region ICOC

18   congregation located in Los Angeles County, State of California.

19       103.   Bernice was systematically and intentionally indoctrinated by ICOC to

20   believe the following: only members of ICOC were to be trusted; she must comply

21   with any requests she received from adults; all medical treatment must occur within

22   the ICOC by its members; and if she made any reports to the authorities, including

23   Child Protective Services, her actions would result in Bernice being taken into foster

24   care custody where she would be raped daily.

25       104.   In or about 1999, when Bernice was approximately 8 years old, Desiree's

26   friend advised her that her son had been a victim of abuse which caused Deziree to

27   then ask her own children if they too had been victimized. When Deziree asked Bernice

28   if she was abused, she learned that **David Saracino, a member of ICOC, currently**

29   **serving , had in fact sexually abused Bernice**.

30       105.   In response to learning of the abuse David Saracino inflicted upon

Bernice, Desiree immediately traveled to the East Region ICOC in hopes of exposing David Saracino's abuse.

106.   During this time, Rob and Connie Kosberg were leaders of the East Region ICOC.  Desiree met with Rob and Connie in a room located within the church while service was being held and David Saracino was in attendance. Rob and Connie told Desiree they had never experienced any other reports of that nature, apologized to her, and said they would support Desiree in whatever she chose to do. Rob and Connie also advised her that she should take some time to decide the best course of action.

107.   The following day, **Desiree contacted the West Covina Police Department and filed a report against David Saracino**. Unfortunately, by this time, **David Saracino had already been tipped off by the leaders of ICOC and relocated to Escondido, CA**. The investigation went stale because of ICOC's cover up efforts.

108.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Bernice suffered and continues to suffer a litany of injuries.  Among other injuries, Bernice has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The Childhood Abuse of Plaintiff Darleen Diaz**

109.   Darleen Diaz was born on August 9, 1989, in California. Darleen is the older sister of Bernice Diaz, mentioned above.  When Desiree, Darleen's mother, first approached Bernice and Darleen in 1999 and discovered Bernice's sexual assault by David Saracino inflicted upon her Darleen initially denied experiencing any abuse. It was not until age 13 that **Darleen disclosed the abuse she endured to Bernice. At only 9 years old, Darleen was sexually abused by David Saracino in or about 1998**.

110.  Similar to Bernice, Darleen was systematically and intentionally indoctrinated by ICOC to believe that: only members of ICOC were to be trusted; she must comply with any requests she received from adults; all medical treatment must occur within the ICOC by its members; and any reports to the authorities, including Child Protective Services, would result in Bernice being taken into foster care custody

where she would be raped daily.

111.   As with many children who suffered childhood sexual abuse, Darleen's internal defense mechanisms repressed the abuse and as a result, discovery of the abuse was delayed until Darleen reached middle school. In addition, as the eldest child, Darleen wanted to be the "strong one" for her sister, and took extra abuse from David Saracino to protect her sister.

112.   One time in particular, Darleen laid on top of Bernice in the backseat of the car, while David Saracino was sexually assaulting her in the backseat. Darleen wanted her sister Bernice to get all of the counseling and all of the help she needed, and didn't want to take anything away from Bernice, so she initially denied the sexual abuse.

113.   After an incident triggered Darleen during her early teen years, Darleen felt compelled to disclose the abuse to her mother. Subsequently, Darleen tried to commit suicide in her early teens by trying to jump out of the car on the freeway.

114.   David Saracino invited Darleen, her sister and other young girls, to his home that he shared with other male church members from the ICOC. David Saracino convinced the girls to go swimming in his pool, which was merely an excuse for the girls to get undressed.  He told the girls that they needed a bath and he used that opportunity to **heavily fondle their naked bodies while they were bathing**.

115.   In addition, David Saracino executed his abuse scheme by fabricating excuses to pick up or drop off Darleen and Bernice to/from school. David Saracino often **preyed upon single mothers who worked full-time**, as he sought to exploit their vulnerabilities by offering to transport and/or babysit their children. Desiree, the girls' mother she was counseled by the ICOC that she needed to trust David Saracino, as he was her "brother" in Christ.

116.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Darleen suffered and continues to suffer a litany of injuries. Among other injuries, Darleen has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income,

and loss of future wages.

**The Childhood Abuse of Ashley Ruiz**

117.    Plaintiff Ashley Ruiz was born in Los Angeles, State of California. Ashley's mom were members of the East Region branch of ICOC beginning in approximately 1994. Ashley, like Bernice and Darleen, also experienced sexual abuse at the hands of David Saracino.

118.    Ashley's abuse is documented in a police report dated October 28, 2004, filed by her mother Arlene Rangal approximately 8 years after the abuse occurred. During a conversation with a family member on or about October 28, 2004, Ashley recalled the sexual assault she repressed for many years.

119.    David Saracino often coerced Ashley's mother Arlene to drop Ashley off at his residence, would pick Ashley up from school without Arlene's permission, and was consistently forcing himself into Arlene's life so that Saracino could gain access to Ashley. It was during these times that David Saracino sexually assaulted Ashley.

120.    When Ashley was approximately 5 years old, David Saracino would frequently, and without her mother's permission, pick her up from school, take her to his personal residence, and would intimidate her using a consistent formula of sexual abuse. First, Saracino would force Ashley to watch pornographic videos depicting females performing fallatio as a demented version of a classroom scenario, where he would also consistently tell her that she needed to learn to "please her man." Afterward, Saracino would then use the pretense of allowing her to swim in the pool he had on-site. David had virtually no intention of simply "allowing" Ashley to use his swimming pool. **David Saracino would either physically undress her himself while fondling her developing body, or he would intimidate her into fully undressing and then Saracino would commonly lick her vagina** After feigning ignorance over her lack of swimwear David would force her to swim naked or in her underwear while he would watch intently. After giving Ashley some time to swim, Saracino would take her inside his home, physically "bathe" her, and would force her to allow him to perform oral sex on her. Saracino would then either take Ashley home or would call her mother to pick her up. Saracino always intimidated Ashley into not telling anyone, including her

1   family, and that "everything would be ok."

2   **The Sexual Abuse of Salud Gonzalez**

3       121.   Salud Gonzalez was born in 1992.

4       122.   Salud's parents were baptized into ICOC in 1995 when Salud was 3 years
5   old. Salud's parents attended church at the Los Angeles location where Salud was
6   forced to attend the church's Sunday School program also known as Kid's Kingdom.

7       123.   Similar to Bernice, and Darleen, Salud was systematically and
8   intentionally indoctrinated by ICOC to believe that: only members of ICOC were to be
9   trusted; she must comply with any requests she received from adults; all counseling
10  and/or therapy must occur within the ICOC by its members; and any reports to the
11  authorities, including Child Protective Services, would result in children being taken
12  into foster care custody where she would be raped daily.

13      124.   **Beginning at the age of 4, Salud was sexually assaulted at the hands**
14  **of Fernando Sanchez, the Kid's Kingdom Teacher at ICOC**. The abuse continued
15  for five years.

16      125.   When Salud was 9, her parents were recruited by Mr. McKean to start a
17  church in Portland, Oregon.

18      126.   In or about 2004, when Salud was approximately 12 years old and living
19  in Portland, Fernando Sanchez contacted Salud by telephone. Salud could no longer
20  keep secret the abuse she endured, and she informed her parents of the sexual abuse
21  Fernando Sanchez committed.

22      127.   Upon learning of the sexual abuse by Fernando Sanchez, Salud's father
23  informed ICOC leadership and demanded they take action and at least remove Sanchez
24  from his role at Kid's Kingdom. No action was taken by ICOC leadership and Sanchez
25  continued to teach at Kid's Kingdom no doubt abusing other children.

26      128.   In 2007 at the age of 15, Salud moved back to Los Angeles with her
27  parents. At the time Salud was experiencing serious substance dependency issues.
28  Salud's parents demanded that she participate in the "Chemical Recovery" rehab
29  through the ICC. By this time, Salud's parents had left the ICOC and followed Mr.
30  McKean to the ICC.

129.   The leaders of the "Chemical Recovery" rehab were Russ and Lana Preston but the program was run by Selina Ann Boquet and Omar Valdavinos. Selina and Omar were married at the time and close friends of Salud's parents. Selina was also a kindergarten teacher at the time and currently is employed by a School District in the State of Texas.

130.   Once Salud enrolled in the "Chemical Rehab" program and despite having no training in substance rehab, Salena was assigned to Salud's rehab process.

131.   **Instead of assisting Salud with her substance dependency, Selina would provide alcohol to Salud at the "rehab" meetings sexual assaulted her.**

132.   In 2008 Selina confessed to her then sister-in-law, Aurora, that had engaged in sexual activity with Salud. Aurora reported this information to ICC leadership and others but no action was taken against Salena. **Instead of taking action against Selina, the ICC leadership in Los Angeles met and determined that Salud would be blamed for the sexual abuse by Selina because Salud was "very powerful" suggesting that Salud was a 15-year-old seductress. The ICC leaders who made this decision included, Michael Kirchner,  Tony and Therese Untalan, Tim and Lianne Kernan and Nick and Denise Bordieri. Salud was thrown out of the ICC for "adultery" at age 15. Selina divorced Omar and left the ICC as well. Salud's father was told by ICC leaders that Salud would have to apologize to the church members for her "affair" with Selina in order to return to the ICC**.

133.   Also in 2008, Salud's father was told about the abuse by Fernando Sanchez. Although Salud's family had left the ICOC and moved on the ICC by that time, her father attempted to confront Fernando Sanchez (only to learn that Sanchez had moved). Immediately thereafter, Salud's father confronted Marty Fuqua, the leader of the Los Angeles ICOC, and demanded that action be taken in connection with Fernando Sanchez. In response, Fuqua told Salud's father "What do you want me to do about it?"

134.   In 2008, Salud was also sexually assaulted by Josue Soriano. Salud was 17 and Soriano was 30 at the time when the ICC paired them and boyfriend and girlfriend.

135.   From 2008 to December 2021 Salud had no contact with Salena. In December 2021, Salud found Salena in Austin, Texas. Salud contacted Selina and confronted her about the sexual abuse. Selina invited Salud to Austin and apologized to Salud. Salud remained in Austin with Selina for 6 months. During that time, Selina attempted to further manipulate Salud. During that period of time, Salud attempted suicide by hanging herself.

136.   As a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Salud suffered and continues to suffer a litany of injuries. Among other injuries, Salud has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**The Sexual Abuse of Elena Peltola**

137.   Elena was forced into the ICOC as a child by virtue of her parents' participation.

138.   In, 2012 when Elena was 13, she was sent on an ICOC mission trip to Honduras. The trip was organized by ICOC's affiliate defendant HOPE Worldwide.

139.   Although the minimum age to participate in mission trips was 16, Elena was "encouraged" to participate in the 2012 trip by Dr. Milton Drake. Drake was the lead director and board member of Hope.

140.   Prior to the 2012 trip, Elena was groomed by various ICOC and Hope leaders. Comments were made about her early physical development among other things. She was instructed to trust and obey all of the "brothers" in the church and rebuked anytime she would question church leaders.

141.   While on the 2012 mission trip, Elena was lured into an isolated location in the jungle and repeatedly raped by a 25-year-old male member of the ICOC for four (4) hours. When Elena was able to escape, she sought out her mother who was also on the trip. However, Elena was in complete shock and unable to talk for several days.

142.   Upon return to Boston, Elena was ordered by Drake and various ICOC and Hope leaders to provide a written account of what occurred during the the 4 hours she was "missing" so that the leadership could decide if "she would be allowed to participate in future fun events". Thereafter, Elena was isolated from other teens and generally treated differently from the others. After Elena wrote a statement describing her assault, ICOC and Hope leaders and other victim blamed her and called her a "slut" for several months.

143.   After repeated interrogations the leadership determined that Elena was a "liability". Eventually, Elena was kicked out of the ICOC. No report of her rape was made by ICOC or Hope leadership to law enforcement.

144.   In June 2022, the ICOC and Hope published a picture, depicted below, of Elena from the 2012 Honduras mission trip as part of its marketing materials. The picture was the day before Elena was raped.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30



COMPLAINT

# FIRST CLAIM FOR RELIEF
## SEXUAL ASSAULT OF A MINOR
*(Against All Defendants and Does 1-100)*

145.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

146.   Defendants intentionally, willfully, and maliciously sexually assaulted and/or sexually abused and molested Plaintiff during the time that Plaintiff was a minor.

147.   In committing the unlawful acts of sexual assault against Plaintiff, the Defendants intended to put Plaintiff in imminent apprehension of harmful or offensive contact.

148.   The Defendants put Plaintiffs in imminent apprehension of such harmful offensive contact as Plaintiffs actually believed the Defendants had the ability to make harmful or offensive contact with plaintiff's person.

149.   Plaintiffs did not consent to the Defendants' intended harmful or offensive contact with plaintiff, the Defendants' intention to put Plaintiffs in fear of imminent apprehension of such contact, plaintiff was a minor during the time herein alleged and, therefore, lacked the ability to consent to sexual contact with any person, including the Defendants.

150.   As a direct and legal result of this conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

151.   The Defendants conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish, and emotional and physical distress.

152.   The  Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

## SECOND CAUSE OF ACTION

### VIOLATION OF PENAL CODE 647.6(a)(1)

*(Against All Defendants and Does 1-100)*

153.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

154.   California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not exceeding  five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

155.   As alleged herein, the  Defendants engaged in sexual penetration with Plaintiffs while Plaintiffs were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

156.    Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). See Angie M. v. Superior Court, (1995) 37 6 Cal.App.4th 1217, 1224-1225.

157.   The Defendants above-noted actions in annoying and molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages Plaintiffs have suffered and continues to suffer to this day. It also has resulted in Plaintiffs incurring, and will require Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

158.   The above-described conduct of the  Defendants was oppressive, malicious  and despicable in that it was intentional and done in conscious disregard for the rights and safety of Plaintiffs, and was carried out with a conscious disregard of Plaintiffs right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling Plaintiffs to

punitive damages against the Defendants in an amount appropriate to punish and set an example of them.

### THIRD CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against All Defendants and Does 1-100)*

159.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

160.   The conduct of all Defendants as set forth in this Complaint was extreme and outrageous, and committed with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

161.   A reasonable person would not expect or tolerate the sexual assault committed by Defendants.

162.   A reasonable person would not expect, accept or tolerate Defendants' unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

163.   Defendants' conduct exceeded all bounds of that usually tolerated in a civilized community.

164.   Defendants intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs, manipulated and brainwashed Plaintiffs into silence and actively concealed Plaintiffs' abuse.

165.   Plaintiffs have suffered severe and/or extreme distress as a result.

166.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

167.   Defendants' conduct described herein was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause

Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

168.    Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

## FOURTH CAUSE OF ACTION

### NEGLIGENT HIRING, SUPERVISION, AND RETENTION

*(Against All Defendants and Does 1-100)*

169.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

170.    At all times relevant, a special relationship existed between  Defendants and the  Defendants, because the  Defendants were the agents of  Defendants, each of whom had the ability to control of the  Defendants' conduct, yet failed to exert it. In doing so,  Defendants created a widespread culture of acceptance of the abuse of children, as  Defendants and the  Defendants collectively brainwashed and manipulated Plaintiffs to remain silent about the abuse and these Defendants also actively concealed the abuse to avert discovery by the authorities.

171.    At all times herein.  Defendants, and each of them, negligently supervised, managed, and controlled the  Defendants in their membership and participation in Defendants' Church, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the Church, of the propensity and risk that the  Defendants would sexually assault, sexually abuse, and/or molest minor children, a propensity and history of which  Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.

During the same time period.  Defendants, and each of them, were negligent in failing to exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at  Defendants' Church, from the risk of sexual assault, sexual abuse and molestation by perpetrators, including the  Defendants.

172.    Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of

child abuse/assault by the  Defendants when they learned of this fact.  Defendants' failure to report the known and/or reasonably suspected child abuse of Plaintiffs, but instead the  Defendants perpetuated and facilitated the  Defendants' continued sexual abuse and/or sexual assault, and molestation of Plaintiffs.

173.  If  Defendants satisfied their duty to take reasonable steps to protect Plaintiffs all minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiff's injuries would have been avoided.

174.  Prior to, during, and after the sexual assault of Plaintiffs,  Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that the  Defendants had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

175.  Plaintiffs are informed, believes, and thereupon alleges that prior to, and during the  Defendants' sexual assault and/or sexual abuse, and molestation of Plaintiffs,  Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the  Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead,  Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact with the  Defendants thereby ratifying and facilitating the  Defendants' continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

176.   Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their pastor, deacon, employee, and/or agent, to wit, the Defendants.

177.  If  Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against her and the resulting harm.

178.  As a direct and legal result of  Defendants' conduct. Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other

expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

179.   Plaintiffs are informed, believes, and thereupon alleges that  Defendants' failure to respond, investigate, terminate the Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by the  Defendants was part of  Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

180.   Plaintiffs' damages as a result of the  Defendants' repeated sexual assault, abuse, and molestation of Plaintiffs was a direct result of  Defendants' concealment and cover-up. As such. Plaintiffs are entitled to treble damages against   Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

## FIFTH CAUSE OF ACTION

### NEGLIGENT SUPERVISION OF A MINOR

*(Against All Defendants and Does 1-100)*

181.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

182.   Defendants and McKean and Lucas (McKean and Lucas are collectively, the "Church Leader Defendants"), and each of them, were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs.   Defendants and Church Leader Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by the  Defendants.

183.   Defendants and Church Leader Defendants, and each of them, breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because officers, administrators, agents, and other supervisory employees knew or should have known of the  Defendants' improper behavior, including that minor children, including Plaintiffs, were frequently alone with the  Defendants without any

justification, that the  Defendants would frequently touch and sexually abuse minor children, including Plaintiffs, at Church Leader Defendants and  Defendants' Churches without any justifiable reason for doing so, including when the minor children were by themselves, and the  Defendants sexually abused, assaulted, and/or molested minor children, including but not limited to Plaintiffs.

184.  Defendants and Church Leader Defendants, acting through their administrative and supervisory employees, knew or should have known that Plaintiffs were unattended and unsupervised with the  Defendants on numerous occasions, without any justification.

It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither Plaintiffs, nor any other child, should have been alone with the  Defendants. The employees and agents of  Defendants and Church Leader Defendants instead turned a blind eye to the fact that the  Defendants were spending time with minor children, including Plaintiffs, unattended and unsupervised without any investigation into the matter.

185.  After engaging in grooming activity of Plaintiffs while spending time alone with Plaintiffs, the  Defendants started sexually assaulting, sexually abusing, and molesting Plaintiffs and other minor children on  Defendants' premises and during Defendants and Church Leader Defendants' church related services. The acts of sexual assaults and abuse occurred while Plaintiffs were left unattended and unsupervised with Plaintiffs.

186.  If  Defendants and Church Leader Defendants, and each of them, adequately and properly supervised, monitored, and protected Plaintiffs, Plaintiffs would not have been  harmed, or would not have been harmed to the extent that Plaintiffs were.

187.  Defendants and Church Leader Defendants, and each of them, also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor members.

188.  If  Defendants and Church Leader Defendants, and each of them,

adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by the Defendants.

189.   Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, but which exceed the jurisdictional limits of the Superior Court as a direct and legal result of the acts and omissions of Defendants and Church Leader Defendants, and each of them.

## SIXTH CAUSE OF ACTION

### FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION 11165. ET SEP. BASED ON VICARIOUS LIABILITY

*(Against All Defendants and Does 1-100)*

190.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

191.   Defendants and Church Leader Defendants, through their administrators and employees knew or reasonably suspected that the Defendants had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of Defendants, and each of them, and thus had a duty to report the Defendants to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. (Penal Code §§ 11164-11174.3, "CANRA".)

192.   At all times relevant herein and material hereto, the Defendants were employees of Defendants and Church Leader Defendants. Defendants and Church Leader Defendants were responsible for hiring, training, supervising, and retaining the Defendants as part of their church and youth bible studies program. Defendants and Church Leader Defendants' staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as employees and/or agents of Defendants and Church Leader Defendants.

193.   Defendants' and Church Leader Defendants' administrators, board members, and employees are mandated reporters under Penal Code section 11165.7.

194.   Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

195.   As set forth in this Complaint,   Defendants and Church Leader Defendants, through their administrators, board members, and employees knew and/or reasonably suspected that children had been sexually assaulted by the  Defendants, prior to the  Defendants' sexual assault of Plaintiffs, giving rise to a duty to report such conduct under CANRA.

196.   Defendants and Church Leader Defendants, through their administrators, board members, and employees knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the Plaintiffs, existed because Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

197.   Defendants, through their administrators, board members, and employees, including but not limited to and Church Leader Defendants, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed Plaintiffs and other minors to sexual molestation and abuse,

198.   If   Defendants, through their administrators, board members, and employees, including but not limited to the Church Leader Defendants, complied with CANRA's mandatory reporting requirements, then Plaintiffs would not have been harmed at all or to the extent that she was.

199.   As a direct result of  Defendants and Church Leader Defendants' failure to comply with CANRA's mandatory reporting requirements, through their administrators, board members, and employees.  Defendants and Church Leader Defendants wrongfully denied the Plaintiffs the intervention of child protection

services and constituted a per se breach of Defendants, through their administrators, board members, and employees, duties to Plaintiffs.

200.   As a direct and legal result of Defendants and Church Leader Defendants' conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE

*(Against All Defendants and Does 1-100)*

201.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

202.    Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of the  Defendants by way of the special relationship existing between those individuals and Plaintiffs.

203.   Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of the Defendants directed towards minor children, including Plaintiffs.

204.   Despite having knowledge of the misconduct of the  Defendants, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

205.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by the Defendants.

206.   If Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against Plaintiffs and the resulting harm.

207.   As a direct and legal result of Defendants' conduct, Plaintiffs suffered

severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## EIGHTH CLAIM FOR RELIEF

**Violation of Federal Racketeer Influenced and Corrupt Organization ("RICO") Act 18 U.S.C. § 1962(c)**

*(Against All Defendants and Does 1-100)*

208.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

209.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.

210.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

211.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual bishops, and headquartered in Los Angeles, California.  Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today.

212.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5).

213.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of

minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

214.    Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

215.    Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

216.    Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

217.    Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

218.    Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

219.    Upon information and belief, Defendants' pattern of racketeering behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

220.    Defendants and the Abuse Enterprise regularly move goods, money, and

people across state lines, and are therefore engaged in interstate commerce.

221.   As a direct and proximate result of Defendants' patterns of racketeering behaviors, Plaintiffs have sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

222.   Plaintiffs are therefore entitled to recover treble the damages she sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## NINETH CLAIM FOR RELIEF

### Sexual Battery in Violation of Cal. Civ. Code § 1708.5

*(Against All Defendants and Does 1-100)*

223.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

224.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

225.   Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

226.   As alleged herein, Plaintiffs the victim of sexual battery as a minor perpetrated by the  Defendants. The  Defendants subjected Plaintiffs to this sexual battery at the hands of while Plaintiffs were minors.

227.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

-48-

228.   The  Defendants,  Defendants and Church Leader Defendants knowingly conspired and/or aided and abetted to force Plaintiffs into sexual battery with the Defendants, and such sexual battery did, on multiple occasions, occur.

229.   Plaintiffs were minors minor when the  Defendants sexually battered them.

230.   Each Defendant knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with the  Defendants, all in furtherance of sexually battering Plaintiffs and in furtherance of the Abuse Enterprise.

231.   The sexual battery of Plaintiffs by the Abuse Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

232.   As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

233.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

234.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

## **TENTH CLAIM FOR RELIEF**

### **Gender Violence in Violation of Cal. Civ. Code § 52.4**

*(Against  Defendants and Does 1-100)*

235.    Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

236.    Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

237.    Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.

238.    As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by the  Defendants and facilitated by all Defendants herein.   Defendants subjected Plaintiffs to these multiple incidents of sexual battery at the hands of the  Defendants while Plaintiffs were minors.

239.    Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

240.    As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by the  Defendants while they were minors.

241.    Each Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with the  Defendants, all in furtherance of committing acts of gender violence against Plaintiffs.

242.    The repeated sexual battery of Plaintiffs by the  Defendants was the result of Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

243.    As a direct and proximate cause of Defendants' actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

244.    The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and

safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

245.   Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper.

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

     (a)    Compensatory and special damages in an amount to be proven at trial;

     (b)    Statutory penalties and liquidated damages according to proof at time of trial;

     (c)    Punitive and exemplary damages in an amount according to proof at the time of trial;

     (d)    Treble damages;

     (e)    Pre- and post- judgment interest;

     (f)    Reasonable attorney's fees and costs; and

     (g)    Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: December 30, 2022          By:     */s/ Bobby Samini*_____

Bobby Samini, Esq.
Michael Katz , Esq.
Steve Baric, Esq.
John S. Oney, IV, Esq.
Attorneys for Plaintiffs
Salud Gonzalez, Darleen Diaz, Bernice Perez,
Ashley Ruiz, and Elena Peltola