**SAMINI BARIC KATZ LLP**
Bobby Samini, Esq. (SBN 181796)
Michael Katz, Esq. (SBN 181728)
Steve Baric, Esq. (SBN 200066)
John S. Oney IV, Esq. (SBN 338596)
650 Town Center Drive, Suite 1500
Costa Mesa, CA 92626
Telephone: (949) 724-0900
Fax: (949) 724-0901
Email: bobby.samini@sbklawyers.com
Email: michael.katz@sbklawyers.com
Email: steve.baric@sbklawyers.com
Email: john.oney@sbklawyers.com

*Attorneys for Plaintiffs Darleen Diaz, Bernice Perez, Desiree Perez, Jane Roe 8, and Ashley Ruiz*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DARLEEN DIAZ, an individual; BERNICE PEREZ, an individual; DESIREE PEREZ, an individual; JANE ROE 8, an individual; and, ASHLEY RUIZ, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL CHURCHES OF CHRIST, INC., an unincorporated association and former California nonprofit corporation; THOMAS ("KIP") McKEAN, an individual; ROB KOSBERG, an individual; CONNIE KOSBERG, an individual; STEVE GANSERT-MORICI, an individual; JACQUELINE GANSERT-MORICI, an individual; DAVID SARACINO, an individual; CHRIS DEL ROSARIO, an individual; BRUCE WILLIAMS, an individual; ROBIN | Case No. 2:22-cv-09467-ODW-PLA<br><br>**FIRST AMENDED COMPLAINT FOR:**<br>1. **SEXUAL ASSAULT OF A MINOR**<br>2. **VIOLATION OF PENAL CODE § 647.6(a)(1)**<br>3. **VIOLATION OF PENAL CODE §§ 288(a), (b)(1), (b)(2)**<br>4. **SEXUAL ASSAULT**<br>5. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>6. **SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5**<br>7. **GENDER VIOLENCE IN VIOLATION OF CAL. CIV. CODE § 52.4**<br>8. **NEGLIGENT HIRING, SUPERVISION, AND RETENTION**<br>9. **NEGLIGENT SUPERVISION OF A MINOR**<br>10. **FAILURE TO REPORT** |

Case No.

| | |
|---|---|
| WILLIAMS, an individual; and DOES 1 through 10, inclusive,<br><br>           Defendants. | **SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE SECTION §§ 11165 ET SEQ. BASED ON VICARIOUS LIABILITY**<br>**11. NEGLIGENCE**<br>**12. VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(C)**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs DARLEEN DIAZ, BERNICE PEREZ, DESIREE PEREZ, JANE ROE 8, and ASHLEY RUIZ (collectively, "Plaintiffs") hereby submit this First Amended Complaint, under federal question and supplemental jurisdiction against Defendants INTERNATIONAL CHURCHES OF CHRIST, INC., THOMAS "KIP" McKEAN, ROB KOSBERG, CONNIE KOSBERG, STEVE GANSERT-MORICI, JACQUELINE GANSERT-MORICI, DAVID SARACINO, CHRIS DEL ROSARIO, BRUCE WILLIAMS, ROBIN WILLIAMS, and all other named and unnamed defendants (collectively "Defendants") and states as follows:

## INTRODUCTION

1.     This action is one to recover damages on behalf of adult victims of childhood sexual assault.  It governed by California's Code of Civil Procedure section 340.01 ("section 340.01").  It is also an action to recover damages on behalf of adult victims of sexual assault that occurred after the age of majority; to that extent, it is governed by California's Code of Civil Procedure section 340.16 ("section 340.16").

2.     The incidents of adult and childhood sexual assault against Plaintiffs alleged herein were facilitated and actively concealed by Defendants, including while four of the Plaintiffs were minors.

3.     This case arises from an ongoing and systemic scheme of abuse that shocks the conscience from its appallingly epic proportions. The ICOC and its affiliate churches have created a money-making enterprise through its psychological manipulation, tight control, and hierarchical "discipleship" structure.  That same structure fostered an environment fertile for sexual abuse.  Sexual predators gained unfettered access to manipulated women and children.  They could abuse them without fear of accountability. Instead of taking action, the ICOC, its leaders, and its affiliates did more than turn a blind eye—together, they actively concealed the abuse in order to protect their mega-church tithing empire.  As a result, the ICOC and its leaders, from top to the bottom, aided and abetted the continued sexual abuse of women, minors, and even children as young as 3 years old, some of whom were raped and sexually abused

1    with impunity by trusted church members.

2        4.      Pursuant to Federal Rule of Civil Procedure 20(a)(1), Plaintiffs Desiree

3    Perez and Jane Roe 8 join this action because their causes of action arise out of the

4    same of the same transaction, occurrence, or series of transactions or occurrences as

5    the extant Plaintiffs, and common questions of law and fact will arise in this action

6    concerning their claims.

7                        **JURISDICTION AND VENUE**

8        5.      This Court has federal subject matter jurisdiction over this action pursuant

9    to 28 U.S.C. § 1331 because it arises under the Racketeer Influenced and Corrupt

10   Organizations Act (18 U.S.C. §§ 1961 *et. seq.*).

11       6.      Pursuant to California's Code of Civil Procedure § 340.1(a), actions for

12   the recovery of damages suffered as a result of childhood sexual assault shall be

13   commenced within 22 years of the date the plaintiff attains the age of majority or

14   within five years of the date the plaintiff discovers or reasonably should have

15   discovered that psychological injury or illness occurring after the age of majority was

16   caused by the sexual assault, whichever period expires later, for any of the following

17   actions: (1) an action against any person for committing an act of childhood sexual

18   assault; (2) an action for liability against any person or entity who owed a duty of care

19   to the plaintiff, if a wrongful or negligent act by that person or entity was a legal

20   cause of the childhood sexual assault that resulted in the injury to the plaintiff; or, (3)

21   an action for liability against any person or entity if an intentional act by that person

22   or entity was a legal cause of the childhood sexual assault that resulted in the injury to

23   the plaintiff.

24       7.      Additionally, pursuant to Code of Civil Procedure § 340.1(q), there is a

25   three (3) year window in which all civil claims of childhood sexual assault are revived

26   if they have not been litigated to finality. This provision provides that,

27   "[n]otwithstanding any other provision of law, any claim for damages described in

28   paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to

finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and these claims may be commenced within three years of January 1, 2020. A plaintiff shall have the later of the three-year time period under this subdivision or the time period under subdivision (a) as amended by the act that added this subdivision." The claims herein have not been previously litigated to finality; thus, they are timely under the revised provisions of Code of Civil Procedure §340.l(q).

8.      This Court has supplemental jurisdiction over all asserted state law claims pursuant to 28 U.S.C. § 1367 because all state law claims are so related to, and arise from, the same common nucleus of operative facts from which the federal claims arise and, therefore, they form part of the same case or controversy under Article III of the United States Constitution.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claims occurred in this District. Additionally, the "nerve center" of the International Churches of Christ falls within the jurisdictional boundaries of the Central District of California.

## THE PARTIES

**A.      Plaintiffs**

10.      Plaintiff Darleen Diaz ("Plaintiff Darleen" or "Darleen") is a citizen and resident of Los Angeles, California. Plaintiff Darleen was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

11.      Plaintiff Bernice Perez ("Plaintiff Bernice" or "Bernice") is a citizen and resident of Los Angeles, California. Plaintiff Bernice was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

12.      Plaintiff Desiree Perez ("Plaintiff Desiree" or "Desiree") is 49-year-old citizen and resident of California. Desiree was a citizen of the United States of

America, and resident of the State of California when she first became a victim and survivor of Defendants' sexual abuse. She is a former member of the Los Angeles East Region ICOC.

13.     Plaintiff Jane Roe 8 is a 29-year-old female citizen and resident of Los Angeles, California. Jane Roe 8 was a minor, a citizen of the United States of America, and a resident of California when she first became a victim and survivor of Defendants' sexual abuse and trafficking.

14.     Plaintiff Ashley Ruiz ("Plaintiff Ashley" or "Ashley") is a citizen and resident of Los Angeles, California. Plaintiff Ashley was a minor, citizen of the United States of America, and resident of the State of California at the time that she first became a victim and survivor of Defendants' sexual abuse and trafficking.

**B.     Defendants**

15.     Defendant International Churches of Christ, Inc. (the "ICOC") was a religious non-profit corporation organized and existing under and by virtue of the laws of the State of California that dissolved in 2010.[1] On information and belief, the ICOC now operates as an unincorporated association with its nerve center and leadership centralized in its churches located in the County of Los Angeles. The ICOC purposefully conducts substantial religious and affiliated programs and activities in the County of Los Angeles. The ICOC has ecclesiastical, governmental, and administrative authority over the business and conduct of all locations worldwide. This authority includes, but is not limited to, the selection of ministers, the direction of liturgical interpretation, the collection of tithings and additional funds, and the issuance of behavioral and commercial directives for members worldwide.

16.     Defendant Thomas "Kip" McKean ("Kip" or "McKean"), upon

---

[1] On information and belief, the individuals who undersigned the dissolution—James Blough, David Malutinok, Jaime DeAnda, and Tom McCurry—were the administrators and/or board members of the ICOC at the time of dissolution of the ICOC's formal entity.  On information and belief, at all relevant times, James Blough was a resident of Lowell, Massachusetts; David Malutinok was a resident of Marietta, Georgia; Jamie DeAnda was a resident of Irvine, California; and Tom Curry was a resident of Pasadena, California.

information and belief, is a United States citizen, currently residing in Pacific Palisades, California. At all times relevant to the events that form the basis of this Complaint, Defendant Kip was a member of ICOC's Los Angeles regional branch, and later, the City of Angels International Church of Christ in Los Angeles, California. Defendant Kip resided in California for extended periods while conducting business in California on behalf of Defendant ICOC and Defendant ICC.  Defendant Kip's supervision, direction, and control over the ICOC forms the basis of his personal liability.

17.     Defendant Chris Del Rosario ("Del Rosario"), upon information and belief, is a United States citizen residing in California.  At all times relevant to the events that form the basis of this Complaint, Del Rosario was a United States citizen residing in California.

18.     Defendant David Saracino ("Saracino"), upon information and belief, is currently residing in Louisiana in a state penitentiary.  At all times relevant to the events that form the basis of this Complaint, Saracino was a resident of California, a member of the ICOC in Los Angeles and Escondido, and a volunteer worker at the ICOC's Kids Kingdom children's ministry.

19.     Defendant Steve Gansert-Morici upon information and belief, is a United States citizen, currently residing in Manhattan Beach, California. At all times relevant to the events that form the basis of this Complaint, Steve Gansert-Morici was a leader of the East Region Los Angeles ICOC. Steve Gansert-Morici's active concealment of Jane Roe 8's abuse, along with his supervision, direction, and control over Defendants forms the basis of her personal liability. Steve Gansert-Morici is currently a lead evangelist with the South Bay ICOC.

20.     Defendant Jacqueline Gansert-Morici upon information and belief, is a United States citizen, currently residing in Manhattan Beach, California. She is the wife of Defendant Steve Gansert-Morici. At all times relevant to the events that form the basis of this Complaint, Jacqueline Gansert-Morici was a leader of the East Region

Los Angeles ICOC. Jacqueline Gansert-Morici's active concealment of Jane Roe 8's abuse, along with her supervision, direction, and control over Defendants forms the basis of her personal liability. Jacqueline Gansert-Morici is currently a lead evangelist with the South Bay ICOC.

21.     Defendant Rob Kosberg, upon information and belief, is a United States citizen residing in California.  He served as a leader of the East Region ICOC church. His authority, supervision, direction, and control over the East Region ICOC and his acts and omissions regarding Saracino's and Del Rosario's abuse form the basis of his personal liability.

22.     Defendants Connie Kosberg, upon information and belief, is a United States citizen residing in California.  She served as a leader of the East Region ICOC church.  Her authority, supervision, direction, and control over the East Region ICOC and her acts and omissions regarding Saracino's and Del Rosario's abuse form the basis of her personal liability.

23.     Defendant Bruce Williams upon information and belief, is a United States citizen, currently residing in Denver, Colorado. At all times relevant to the events that form the basis of this Complaint, Bruce Williams was an overseeing Elder of the East Region Los Angeles ICOC. Bruce Williams's active concealment of Jane Roe 8's abuse, along with his supervision, direction, and control over Defendants forms the basis of his personal liability. On information and belief, Bruce Williams is retired but still retains a paid role with ICOC.

24.     Defendant Robin Williams upon information and belief, is a United States citizen, currently residing in Denver, Colorado. She is the wife of Defendant Bruce Williams. At all times relevant to the events that form the basis of this Complaint, Robin Williams was an overseeing Elder of the East Region Los Angeles ICOC. Robin Williams's active concealment of Jane Roe 8's abuse, along with her supervision, direction, and control over Defendants forms the basis of her personal liability.

1    25.    Plaintiffs are ignorant of the true names of the defendants sued herein as

2    Does 1-10, inclusive, and therefore sue these defendants by such fictitious names.

3    Plaintiffs will amend the Complaint to allege their true names when ascertained.

4    Plaintiffs allege that, at all relevant times herein, Does 1-10 were the co-conspirators,

5    subsidiaries, employees, employers, and agents of constituent members of Defendants

6    herein. Plaintiffs allege that each of the fictitiously named defendants is legally

7    responsible for the actions forming the basis of this Complaint and that Plaintiffs'

8    losses and damages are the result of their wrongful conduct.

9

10    **GENERAL ALLEGATIONS[2]**

11    **A.    Kip McKean and His Core Leadership Team Spawned a Tightly Woven**

12    **Network of Cult-Like Churches.**

13    26.    In 1979, Kip McKean officially broke off from the traditional Church of

14    Christ—the proto-organization that helped spawn the ICOC.

15    27.    Around that time in Boston, McKean founded what would become the

16    ICOC under the moniker of the "Boston Movement." McKean founded the Boston

17    Movement with 29 other members, who seceded from the Church of Christ based out

18    of Gainesville, Florida.  The fledgling "church" quickly grew, rabidly seeking out

19    new members and enjoying considerable expansion and success. After the Boston

20    Movement obtained religious recognition in the 1980s, it became the ICOC and grew

21    into a multinational movement.

22    28.    Over time, the ICOC morphed into an intricate and intentionally

23    confusing "network of over 700 non-denominational churches in about 150

24    countries." Throughout its history, the ICOC has gone by other names, including the

25    Boston Movement, the Discipling Movement, the Crossroads Movement, and

26    Multiplying Ministries.  Local ICOC churches or assemblies would often append the

27    _____

28    [2] For the convenience of the reader, these general allegations are common to the pleadings in each of the following
related cases before the Court: 22-cv-09467, 22-cv-09472, 23-cv-0064, 23-cv-00765, 23-cv-00999, and 23-cv-01192.

name of their city, in which they were located, to their name, *e.g.*, the Milwaukee Church of Christ or the Sarajevo Church of Christ.

29.     An ICOC umbrella organization was formally incorporated in California in December 1994. Its Articles of Incorporation filed with the California Secretary of State stated that upon dissolution, "the remaining assets of this Corporation shall be distributed to . . . the individual congregations that are part of the worldwide fellowship of churches of Christ (which are affiliated with the Corporation), if they qualify as distributes under the provisions of this Section."

30.     Chuck Lucas, one of the original founding ministers with Kip in Florida, was eventually paid off to leave the group because of his deviant behavior. Early on, the ICOC and McKean strategically downplayed Lucas's pattern of abuse by labeling his conduct as "recurring sins." Sadly enough, those "recurring sins" were never investigated by ICOC. McKean and other ICOC leaders were acutely aware of Lucas's disturbing pattern of abuse, but nevertheless, they actively concealed Lucas's misdeeds to avert discovery by the police or church members. Covering up for Lucas became the blueprint for the ICOC moving forward, integrating coverups and concealment into its organizational DNA.

31.     In 2006, McKean spun off a derivative church, dubbed the International Christian Church (or "the ICC"), after he was forced out of the ICOC.  The ICC was registered in California as a nonprofit religious corporation in October 2006.  As of December 2022, the ICC listed 104 affiliate churches on its website.  Its Articles of Incorporation, filed with the California Secretary of State, included references to affiliates. One part stated that upon dissolution of ICC, "the assets of this Corporation shall be distributed to other nonprofit funds, foundations or corporations affiliated

1   with the International Christian Church.[34]

2   **B.     The ICOC Meticulously Crafted an Enterprise That Enabled, Encouraged,**

3   **and Concealed Sexual and Psychological Abuse.**

4          32.     Under the direction and control of McKean, the ICOC (and, later, the

5   ICC) has collectively exploited everything good and noble in their trusting and loyal

6   members by callously robbing them of their childhood innocence through

7   psychological coercion and manipulation, pervasive sexual abuse of children as young

8   as three years old, and shameful financial abuse. Each of the foregoing abuses was

9   actively concealed by ICOC and its members to avert discovery by child protective

10  services and the police.

11         33.     The ICOC was born out of a "discipling" movement that arose among

12  the Churches of Christ during the 1970s.  The ICOC has maintained this practice into

13  present times. It is a strict practice involving a "discipleship hierarchy" centered

14  around a formal discipleship tree—in other words, a top-down authoritarian

15  hierarchy.

16         34.     McKean co-designed the specific discipling pyramid that would later

17  become the foundational structure of both the ICOC and the ICC as organizations.

18  That pyramid structure served as the mechanism of control and coercion frequently

19  exerted over their members.[5]

20

21  _____

22  [3] Between April 2020 and February 2021, eighteen branches of the ICC received Paycheck Protection Program (PPP) loans. These loans totaled $287,490, and a total of $290,040 was forgiven, including accrued interest.

23  [4] Churches associated with the ICOC appeared to be incorporated into separate entities, according to a review of public records. For instance, the Los Angeles International Church (LAICC), the largest ICOC church by membership, was

24  incorporated in California in December 1990, according to corporate records with the California Secretary of State. The Los Angeles International Church (LAICC) described its structure on its website, noting that it is "organized into eight

25  self-supported regions."  "Each regional evangelist has been given the charge of equipping the brothers and sisters in his part of the LA church (region) to effectively evangelize his area with the saving message of Jesus Christ as well as

26  helping one another mature in Christ."  Notably, "each region has a regional financial advisory group that assists the ministry staff and the Board of Directors with the oversight of the finances in their particular region."

27  [5] Flavlil R Yeakley Jr. documented the "disciplining" movement in a book titled *The Discipling Dilemma*.  The ICOC and ICC have been classified as toxic, destructive cults due to their rigid and pervasive culture of fear, coercion, control,

28  manipulation, judgment, exclusion, and punishment, along with their overt focus on membership growth (to drive income from tithing).

-11-

FIRST AMENDED COMPLAINT

35.     Pursuant to that strict and documented discipleship pyramid, every member has an elder disciple preside over them, who acts as quasi-mentor-qua-jailor.

36.     This carefully crafted "discipleship tree" was nothing short of a sophisticated scheme, deeply rooted in psychological manipulation, accomplished by institutionally normalizing the use of aggressive, abusive, and coercive tactics that brainwash members into fearing the loss of salvation for menial transgressions. It allowed the ICOC and ICC to execute and maintain considerable control over every aspect of every member's life.  Members became systematically deindividualized, only to endure communal isolation from the world at large.

37.     Only those members named as "disciplers" were allowed to provide any counseling to church members.  Abuses were reported only to the "disciplers." ICOC church members and leadership discouraged reporting those abuses to outside authorities by routinely branding abuse victims as "disobedient" and blaming them for the abuse they suffered.  Many incidents, which could have reported, therefore never were.

38.     McKean and the ICOC created a religious practice that required victims to confess their "sins" daily.  "Disciplers" would then share the specifics of those "sins" with other groups and leaders to reinforce their control over the victim. This pattern of practice allowed McKean and the ICOC to leverage the abuse as emotional blackmail within the community.

39.     An illustration of the ICOC's hierarchical model of authority is depicted below:


**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

The ICC had a complex and highly hierarchical organizational structure, unusually so for a relatively new and small religious group. There are many layers of leadership, similar to a pyramid or the Roman Catholic Church.



The ICC has a pyramid-shaped, hierarchical structure of authority. At the top was Kip McKean, the *World Missions Evangelist*, and his wife Elena Garcia-McKean, who served as *Women's Ministry Leader* for the group as a whole. As of November of 2002, the Mckeans

## C.   As Designed by McKean, the ICOC Systematically Indoctrinates, Brainwashes, and Manipulates Its Members.

40.    Initially, new recruits receive profound amounts of "love bombing" to lure them into a false sense of security, thereby allowing sexual predators to effectively manipulate them and eventually abuse them with the comfort of knowing that these vulnerable and newly brainwashed people would never report the abuse.

41.    Every new member undergoes a rigid conversion process tantamount to systemic brainwashing, called the "First Principles."  Once a new member agrees to all indoctrination related teachings, the neophyte must be baptized in water and commit to devote their entire life and schedule to the church.

42.    The ICOC trains each new member to understand that "compliance was the path of least resistance."  Members genuinely and wholeheartedly believed that

they needed to follow the Bible verbatim, and that the ICOC's leadership were the only "true" modern-day disciples on Earth.

43.     In addition to the "discipler" structure, the ICOC indoctrinated its members with rigid fundamentalist teachings, demanded unyielding compliance with its instruction, and enforced strict social separation.

44.     The "discipler" hierarchy facilitated McKean and the ICOC's systemic concealment of abuse, created a culture of fear among its most vulnerable, and allowed predators to abuse women and children with impunity.  Their practice of concealment became an institutionalized pattern within the ICOC.  For example:

a.     On information and belief, one ICOC member currently owns a school for autistic children in the San Francisco area.  He has been accused of multiple instances of sexual abuse of adults and children/teenagers while he was in Boston. ICOC and McKean were aware of this despicable man's repeated abuse, but McKean orchestrated his relocation from Boston to San Francisco to conceal his predatory practices and avert criminal prosecution.

b.     On information and belief, non-parties Damon and Vicki James, two ICC "disciplers" working under the specific direction of McKean, instructed a member on July 1, 2018, to refrain from reporting two years of physical and sexual abuse by her husband. Damon James even scolded this survivor and stated, "[w]e don't do that to our brothers as disciples."  Vicki James then victim shamed the woman by stating "[w[]hy would you have the heart to press charges?" Damon continued and told the woman, "[w]hat does that gain? That puts you in front of 'the world'."

c.     Former ICOC member Carter Whitten made the following harrowing statement to an ICOC whistleblower regarding the abuse he endured in connection with his "discipler" experience:

> "For reasons I still don't fully understand, my
> 'discipler' met with me and two other teen boys at

one of the boys' houses. In the basement we sat in a circle, and the goal of my discipler was to break me down and to get me to fully understand the horrors of Hell: Meaning what I had to look forward to if I didn't enter the Kingdom (the ICOC) before I died. So next he took it upon himself to paint a vivid picture for me: My discipler described a scene in hell in which I was nailed to a ceiling by my PENIS and spun around by a demon. Hanging only by my genitals, I was forced to watch the devil RAPE my mother repeatedly for all eternity. I was then asked to take that grotesque vignette and multiply its terror by 10,000 (or some other arbitrarily large number) to catch even a glimpse of how utterly horrifying the future awaiting me was, unless I was to get baptized and be saved. I finally broke down and cried. Which was clearly the goal, as the ICOC famously conducted what they called "breaking sessions."

In addition to completing their entire conversion series of Bible studies, there were even more hurdles I was told I had to clear in order to become a baptized disciple. One is that I had to call the fathers of all the girls in the teen ministry to whom I was sexually attracted, confess my sins of lust after their daughters, and ask for the fathers' forgiveness. I was mortified. I then asked another

teen boy—a good friend of mine, if he had been made to do the same thing before he got baptized. He revealed he had indeed been told to do so, and was terrified by the whole ordeal and shunned by most of those fathers.

The final step was the sin letter or sin list. All disciples-in-training (those studying the Bible) were expected to write an exhaustive letter to God, documenting every single sin they had ever committed in their entire lives and asking for forgiveness. The letter was usually meant to be read aloud in a group setting. I was only 14.

I must have been twelve or thirteen when I realized that almost every conversation or sermon in the teen ministry was talking about lust and masturbation and sexual sin on some level. So now looking back as an adult, I am horrified by how perverse and abusive this culture was. Like many evangelical denominations, the ICOC indulged in purity culture and thus placed a heavy emphasis on sexual purity.

But the ICOC took it to a whole new level, the way that adults dealt with teens in these ministries— children that were not their children—seems criminal to me. At the very least, it was a gross and

egregious abuse of the power dynamic between adults and children. And I know enough people across the country in the ICOC to know that this was not an isolated incident, it was literally happening in every 'teen ministry.'

But even worse than this, I had a friend that was physically assaulted while he was studying the Bible, because he tried to get up and leave. So the teen leader held him down and beat him up.

We had to meet in one-on-one and group D-times, where we had to confess our sins (especially sexual sins) in a group setting, and the disciplers (teen leaders) would sometimes confess sins as well. During one such meeting, an adult discipler confessed to a group of four or five boys that he had had a wet dream (nocturnal emission) that week, and in many other meetings we were told by disciplers that masturbation equated to "ejaculating on the cross." I never understood why grown men were spending so much time with boys as young as 12 and 13 confessing all their sexual sins to them… I heard things I had never heard before, and it all felt very abusive and inappropriate to me, even as a child.

Why were grown adults grilling other people's

FIRST AMENDED COMPLAINT

teenagers for specific sexual details . . . When most of these teens had never even had a sexual experience in their life. The abuse of power here and power dynamics were so damaging to most of these teens in the teen ministry, that the PTSD and anxiety and therapy that most of these children have needed their whole lives is astounding."

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

**D.    McKean Structured the ICOC to Maintain Secrecy.**

45.    McKean's carefully crafted church hierarchy lent itself to maintaining secrecy and preventing outside intervention. The following diagram is a rough depiction of the church's organizational structure:



46.    Among other goals, McKean purposefully structured the ICOC's hierarchy to ensure that abuse within the church remained a secret to all outsiders, including the authorities. Indeed, someone within the church was always monitoring lower ranking members and giving them explicit instructions on how to conduct themselves.

47.    McKean and the ICOC's leadership taught, and continue to teach, the doctrine that only fellow church members are "true disciples" of Jesus who will be rewarded with a place in heaven in the afterlife.  Conversely, non-members will not go to heaven because they are not "true disciples." That doctrine engendered an insider-outsider mindset, which allowed scores of sexual predators within the churches to abuse children without fear of criminal prosecution.

48.    The ICOC also created a highly exclusive environment for its members

wherein they were/are prohibited from marrying anyone outside the church.  The ICOC must approve all marriages, which ultimately gives it an incredible degree of control—and power—over each of its members.

49.     Questioning higher ranking members or the church in any manner invited damning ostracization. Sometimes, the ICOC would labels those individuals as "disfellowshipped" or "marked" for being divisive. "Disfellowshipped" meant excommunication.  Being disfellowshipped or marked would lead to ostracization and scorn from the ICOC's communities. From the point of view of ICOC doctrine, being labeled as "disfellowshipped" or "marked" equated to being condemned to hell on earth and in the afterlife, too.  Indeed, that communal ostracization and isolation from the outside world inflicted highly debilitating emotional and mental harm to many of their members and, in some cases, drove them to suicide.

50.     But when it came time to judge known or suspected abusers, the ICOC demanded that its parishioners forgive any slight, no matter how severe, and "move on" without reporting such abuses. Judging the conduct of another, no matter how villainous, was beyond the right of any individual, according to McKean and others, because "no one is free from sin," unless they are male members of the ICOC.

51.     Because of the ICOC's strict rules, the expanse of its control over its members' lives, and the severe consequences it could impose on members who questioned its teachings (let alone transgressed its instructions), the ICOC created the ideal conditions for child molesters, pedophiles, and other sexual abusers to fester and thrive.  Furthermore, McKean and other abusers expressly leveraged the ICOC's hierarchical system of authority to insulate predatory church leaders from exposure. Many of those predators continue to prey upon children without fear of repercussion.

52.     It is commonly understood that McKean was acutely aware of the physical, psychological, and sexual abuses that church leaders (like Chuck Lucas and others) wrought upon both children and adult parishioners of the church. Academic writings, journals, recovered correspondence, newspaper articles, eyewitness

accounts, and publications like the book Toxic Christianity—written by former ICOC leading members under the collective pseudonym "Mr. X"[6]—corroborate that fact. These are but a fraction of the litany of sources of information depicting the practices and abuses that the ICOC institutionalized to the point of normalcy within the church.

53.     To ensure that the ICOC's exploitative conduct remain unchecked, McKean, the ICOC, and its leadership have utilized their vast resources to silence any internal dissidents, including through vexatious litigation. The ICOC has created a "David and Goliath" scenario, swiftly suppressing the few members who have spoken up over the last four decades. The ICOC would use its vast resources to silence any internal dissidents, through coercive, deceptive, and threatening tactics to not only force members to give 10 to 40% of their income every month, but also to turn over student loans, IRS tax returns, children's college funds, heirlooms, stocks, furniture, wedding rings, cars, prized possessions, and literally anything that the ICOC could get their hands on. The ICOC grew its resources from nonstop fundraisers, forcing members to put their "special contribution" amounts of thousands of dollars on credit cards, or borrowing it from outside family members.

54.     When many abused victims escaped the ICOC, they were so financially destitute (and emotionally devastated) that they lacked both the financial resources and emotional resilience to take on the ICOC through legal recourse. The ICOC used this to their advantage, as it would help silence any word of sexual abuse.  In short, McKean and the ICOC intentionally created a system of exploitation that extracts all the financial value it can from its members, which it could deploy to further shield their illicit conduct from discovery by outsiders.

55.     The ICOC and its leaders have cajoled, manipulated, and even coerced parents and other church members to remain silent about the abuses that their

---

[6] It is widely believed that Rick Bauer, a former ICOC member and whistleblower, co-published with another church leader under the pseudonym "Mr. X" and can be accessed in its entirety here: http://www.reveal.org/library/theology/Toxic.pdf

children suffered, such as through payoffs and non-disclosure agreements.  The ICOC's affiliate organizations (*e.g.*, its non-profit arm, HOPE Worldwide) also helped insulated abusers from accountability by lending legitimacy to the ICOC's system of exploitation and abuse.

**E.     McKean Grew the ICOC's Ranks to Feed Its Financial Operation.**

56.     McKean and other ICOC leaders were obsessed with growing church membership because more members meant more revenue from income tithing and other coerced, uncompensated labor from adults and minors.

57.     Accordingly, they imposed recruiting quotas on members to help grow their ranks.  The ICOC requires all its members to recruit a certain number of new members on regular intervals, as well as to bring visitors to all church events.  Tolerating, concealing, and hiding sexual abusers (while at the same time inviting more abusers into the ICOC's ranks) simply became a cost of doing business.

58.     To incentivize bringing new members into the fold, the ICOC cultivated an atmosphere that isolated its members from other social networks, while concealing the systemic abuse of women and children within the church. Members spent every day together; they were not allowed much, if any, contact with family members or friends who were not church members. Of course, the only exception to that strict rule was contact with outsiders for the sole purpose of their recruitment.

59.     Members were required to give at least 10-30% of their income to the churches *before* they were allowed to be baptized and become an official member.

60.     Thereafter, any member's position, health, and wellbeing in an ICOC church community depended heavily upon success in expanding the congregational rosters. Those social incentives created a self-perpetuating business model to attract new recruits/members, and in doing so, generate hundreds of millions of dollars in revenue for the church through new tithing.

61.     Also, the ICOC forced its members to participate in special contributions for missions approximately twice a year equaling approximately 40 times their normal

tithe amount. The ICOC was relentless in its pursuit for funding and church leadership would resort to interrogating members about their income, going so far as to demand copies of the members' paystubs. By way of example, if a member gave $4,000 per month, the total mission contributions for that year would equal an additional (40x) and the total required sum would be $160,000 in addition to the normal yearly tithe amount of $48,000. This particular member would be required to give the church a whopping total of $208,000 for the year.

62.     Children were also asked to contribute, including their labor for events like car washes or baby-sitting.

63.     On information and belief, the ICOC has collected upwards of $10 to $15 billion in tax free contributions over the past four decades.

64.     If the tithing budget was not satisfied, the ICOC forced its leaders or "disciplers" to contribute the financial shortfall themselves.  Examples of the ICOC's pattern of coercive tactics to enforce non-consensual tithing include, but are not limited to, the following:

a.     The ICOC put members, who failed to tithe, on a "weak and struggling list," a list which was known to all ICOC leaders.  If the "weak and struggling" member did not eventually repent and repay the tithe, the ICOC "disfellowshipped" him or her.

b.     The ICOC would ask its members to locate members who failed to tithe and peer pressure them into tithing, for example, by sitting on their porch and waiting until they arrived home to collect the money.

c.     In 2005, two former ICOC members filed a suit in Tennessee claiming the church uses cultlike tactics, manipulation, peer pressure and guilt to force members into tithing and making other financial contributions.  They alleged that for personal gain, "the Nashville Church, the [ICOC], Hope Worldwide, and Central and South America World Sector jointly participated in a scheme to defraud church members, who are not allowed to inspect the church's financial records."

d.      A former member (who only wishes to go by Tina C.) witnessed Non-Disclosure Agreements being forced upon parishioners, claiming that they could never talk about the true finances of the Defendants despite evidence that ICOC opened offshore accounts containing massive quantities of cash.[7]

65.      The pressure to comply with the church's rigid demands became a source of anxiety and depression for many members—so much so that several ex-members committed suicide.

66.      In furtherance of efforts to protect the church and its primary source of revenue (*i.e.*, its members) at all costs, McKean and the ICOC used psychological manipulation to conceal the incidents of abuse.    ICOC members routinely read scripture to discourage "dragging brothers into court."    For example, McKean told members of the ICOC, including the mother of Jane Roe 8, that:

> "We cannot report these abuses, because it would hurt our church, which is God's Modern-Day Movement."

> "Do you want the fall of God's modern-day movement on your head???!!"

> "The cause of protecting God's Kingdom on earth is more important than the sin or the pain of a few individuals."

> "We need to forgive our brothers who sin and realize that they are a new creation in Christ, and give them a chance to make things right. If we report them, it will destroy their lives and hurt the church."

67.      In addition, the ICOC engaged in strategic victim blaming and victim shaming. For example, ICOC leaders blame victims for bringing on their suffering

---

[7] Top leaders of the ICOC put "different ICOC assets and properties in their names" in order shelter and hide those assets "so that the church didn't specifically own them." For example, The Bay Area Christian Church listed its address at the location of the HOPE Technology School for Autistic Children, which was owned by Bay Area Christian Church executive minister Russ Ewell. As of 2022, the property had a total assessed value of $7.7 million, all of which was exempt from taxes under an "other" exemption.  The Bay Area Christian Church also received a PPP loan of $764,600 in April 2020.

FIRST AMENDED COMPLAINT

because their clothing was too provocative, they were supposedly disobedient, or that they did not listen to the ICOC's advice.

68.     Through this combination of tithing, labor contributions, and concealment of crimes through fear, coercion, and manipulation, McKean and the ICOC managed to operate a highly profitable pyramid scheme.

69.     A web of paper corporations and alter ego 501(c)(3) entities supported that pyramid scheme, culminating in hundreds of millions of dollars in illicit gains. The full extent of the ICOC (and the ICC's) profiteering is unknown, especially in view of the tithing and labor contributions that the ICOC and the ICC routinely coerce from their members.

70.     Plaintiffs are aware that the ICOC and the ICC have also benefitted from millions in governmental support through SBA loans, authorized under the Coronavirus Aid, Relief, and Economic Security Act (CARES Act).[8]  Through their abuse of the corporate form and systematic exploitation of their members, the ICOC and the ICC have created literal cash cows built upon layers of lies and deceit.

71.     McKean actively solicited church members to turn over their COVID-19 relief money to the church. The following are excerpts of emails from McKean to various church elders and leaders:

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

---

[8] During the COVID-19 pandemic, branches of ICOC received 77 Paycheck Protection Program (PPP) loans, totaling over $9.4 million. Over $9.2 million of those loans were forgiven, including accrued interest. *See* https://projects.propublica.org/coronavirus/bailouts/ for more information.

**Here are my charges for the USA Churches:**

1. Call your members to give their stimulus checks ASAP. Americans are known to spend everything in their accounts. The great Chicago Church has called these $1,200 checks "Manna from Heaven!"

Presently, all around the world, if a member misses 2 or 3 weeks – usually recognized by missing 2 or 3 weeks of weekly contribution – this is a red flag that they may have become unfaithful. (There of course are always exceptions.) It is a fact that almost every USA Disciple has the ability to give online. So discipling in the COVID-19 Era must include how to give one's weekly contribution online.

Therefore, in the COVID-19 Era to show more forbearance and grace, if a person on your membership has not given for 4 straight weeks – remember this is the USA Churches not third world like India, the Philippines, Africa and some nations of Central and South America – then we must have the conviction that they have become unfaithful to God. At this point, after consulting your World Sector Leader then a decision needs to be made concerning the removal of their name from your membership. However, before that is done, the Evangelist or Women's Ministry Leader must contact them to see if there are extenuating circumstances. Take each situation on a case by case basis.

72.   HOPE, a sham charity organization, is one example of a tax-exempt corporation under the ICOC's and the ICC's corporate umbrellas.  HOPE has generated over $100 million in revenue over the last six years.  It continues to generate a substantial share of its tax-free revenue from its members using substantially similar methods of the ICOC and the ICC, which are characterized by the tax-deductible contributions from third-party corporations and high-net-worth individuals.

**F.    McKean and His Churches Used Children's Ministries to Extend the Abuse Enterprise.**

73.   The ICOC's children's ministry, named the "Kids Kingdom," further insinuated the ICOC into the lives of its members and their children.

74.   The ICOC built a culture of child grooming.  Children were taught from a very young age to "obey" their ICOC elders or face corporal punishment.  The ICOC indoctrinated the children under its control to therefore obey adults and authority figures unquestioningly.

75.     Those policies, practices, and norms allowed the ICOC and its Kids Kingdom, in particular, to become fertile grounds for sexual predators.  Countless instances of abuse happened within the Kids Kingdom ministries themselves, during its hosted mission trips (*e.g.*, HOPE Worldwide trips), and other related religious and social events.

76.     HOPE took teenagers on mission trips around the world to spread God's Word. Many of these children thought they were participating in an evangelical trip. Ultimately, many, including some of the Plaintiffs, were sexually abused by vile adult men. Children and/or their parents reported the sexual abuse, including rape, to elders and doctors (*i.e.*, mandated reporters) within the church, but the church never bothered notifying the police of the illegal activity. There were no instances of any ICOC medical doctors reporting the abuse to anyone, let alone anyone outside the church.

**G.     McKean and His Churches Encouraged Physical Abuse of Children Under the Guise of Discipline.**

77.     In addition to sexual abuse, children in the care of ICOC (and ICC) staff were routinely physically abused under the pretext of "discipline."  The ICOC also instructed the parents to routinely physically abuse their children under the pretext of discipline.

78.     Church leadership often recited the following commonly known passage from Proverbs 13:24 as justification for child abuse: "Those who spare the rod of discipline hate their children. Those who love their children care enough to discipline them."

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

79.     For example, the ICOC instructed its members to spank children, including infants, with a wooden paddle or spoon. Pictured is an example of a custom-made ICOC paddle with a heart shaped hole in it. A true and correct image of the heart shaped paddle is depicted below:



80.     Members were instructed, with visuals, on how to use corporal punishment without leaving bruises, welts, or red marks, so the offending members could not be reported to child protective services. One former member recalls frequently seeing young children at church with welts or bruises on their thighs. On one occasion, this member witnessed a child with a "heart shaped welt" on his/her body.

**H.     Defectors are Beginning to Corroborate the Abuses Publicly, and Experts are Taking Note.**

81.    McKean and his team of capable, well-educated henchmen convinced nearly everyone within his churches to remain silent for the last 43 years. That silence has come to an end.

82.    Some ICOC members were fortunate enough to escape the church's tight grasp and successfully flee the toxic and harmful environment that McKean created.

83.    According to some of the most respected cult experts around the world (such as Dr. Steve Hassan, PhD), the ICOC and ICC are some of the most dangerous cults in existence. The danger arises primarily because the church insidiously masquerades as the approachable 'church next-door' with deeply rooted Biblical foundations. On its face, this public image of the church seems innocent.  But the church's internal machinations are characterized by unmitigated systemic and chronic physical and sexual abuse of children and women within the church.

84.    Defectors have since revealed the abuse they suffered or witnessed at the ICOC.  For example:

a.    Former member (and non-party) Lisa Johnson was a top leader in New York City and a friend of McKean.  In a podcast called *Eavesdropping*,[9] she made the following comments regarding the ICOC based on her personal experience: "Women [in the ICOC] are getting ground up, and I mean tons of people, it's not an isolated case here and there . . . And I think about these women now, after all these years . . . So I'm gonna bring up something here.  . . . There has been sexual abuse, there has been emotional abuse, and there has been some physical abuse of women . . . and part of that is the issue of patriarchy. We developed a system and a way that was not safe for women . . . There are women that have been very damaged and ground up by that.  The fruit of this is so obvious, how can you miss it? How many women have been told to stay with their physically abusive husbands and how many women have

---

[9] The podcast may be accessed from YouTube from https://m.youtube.com/watch?v=mqhs4GJ1D-s&pp=ygUsU3RldmVuIGxlc2xpZSBqb2huc29uIExpc2EgbXkgTGlzYSBhbmQgU2hhcmk%3D.  The statements begin at the 44:40-minute mark and last for about four minutes.

been sexually abused?"

b.     In a 2022 podcast with Steve Johnson,[10] another ICOC defector, James Lloyd, explained the irony of Lucas's pedophilia with young men when the ICOC had implemented its own a LGBTQ+ conversion therapy ministry:

> "The truth is the foundational—what I call—"original sin" of our movement was homosexuality. Man on man.  Specifically, male older leader on young intern . . . Not a few times . . . You can find out, it's not like nobody knows. The fact that our sin, our original sin, was a senior leader [Lucas] who is respected and loved and training a group of young men.  They get in a room and shut door and then this senior leader [Lucas] 'puts the moves' on these young men. And it's worse than it sounds because those men became ministers and went out into their churches and some of them did the same.  And I know that because I was in some of those meetings where it was confessed!
>
> We [the church leadership] thought it was best not to ever share that with everybody, and I heard all the reasons and I bought into them: 'He's got children, you know.' 'He's got children, he's got a wife.' 'You don't just say those things . . . it could hurt the faith of a young Christian.'
>
> All those things are hierarchy saying, that's patriarchy saying, that we don't need to bring this thing up about men on men.  But I'm telling you, one of the problems—and one of the reasons why I call it "original sin"— I don't think that that sin is any different than if it had been a man and a

---

[10] The podcast may be accessed from Facebook at https://www.facebook.com/watch/live/?extid=CL-UNK-UNK-UNK-IOS_GK0T-GK1C&mibextid=2Rb1fB&ref=watch_permalink&v=1109647602942209. The statements begin around 29:00-minute into the clip and continues to the 31:30-minute mark.

woman, by the way, that's not married.  But the fact that we hid it.  You laughed at the word 'transparent.'  That's what we needed. . . We needed to be hearing about that.  People should be taught that that's how things started in our group.  And some of that has continued for three generations. . . . Some of that trauma was carried on, was passed on to other men as those men went out to start their churches. . ."

## I.    The ICOC and the ICC Refused to Report Numerous Pedophiles Who Were Later Arrested.

85.    At least ten pedophiles have been arrested in connection with abuses linked to the ICOC or ICC. Described below, these individuals committed numerous crimes before the police intervened.  On information and belief, they represent only miniscule fraction of the true number of predators who have operated with impunity within the ICOC since 1979.

### 1.    David Saracino

86.    In January 2012, Defendant David Iburg, *a/k/a* David Saracino ("Saracino"), was sentenced to 40 years of hard labor in the State of Louisiana, the maximum sentence, for the **forcible rape of a 4-year-old girl in 2004**.[11] The prosecutor, Cynthia Guillory, told the judge that he was among the worst of the worst. Saracino purposefully sought out women with financial problems so he could gain access to their small children, who became his victims. He had charges and convictions in Texas, Utah, and Louisiana, where he received the 40-year sentence.[12]

87.    Saracino attended the East Region of the Los Angeles ICOC, where several members (single mothers) of the ICOC reported to the leaders in the East

---

[11] *State v. Iburg*, 12-2720  (La.  5/17/13), 118 So.3d  372.

[12] For more information, *see* Theresa Schmidt, *Prosecutor to child rapist: You're the worst of the worst*, KPLC News (Jan. 6, 2012), last accessed June 13, 2023 from https://www.kplctv.com/story/16464797/man-gets-40-years-for-raping-a/?outputType=amp.

Region in or about 1998 that Saracino had continuously molested their daughters. Ultimately, several police reports were filed by the parents, while the ICOC remained silent. Just as the ICOC did nothing to address these reports, Saracino escaped to the San Diego ICOC and freely resided in the Escondido area, temporarily, until fleeing again.

88.    For a time, Saracino disappeared.  He was free to go on a nationwide crime spree, abusing and raping little girls along the way. Saracino was finally caught, but only after an episode of America's Most Wanted produced credible leads that resulted in his capture.

89.    Like so many others, the mothers of the victims were told not to share with anyone else what Saracino had done, as it would "hurt the church."

90.    Had the ICOC assisted in his arrest or alerted their congregations, Saracino could not have continued abusing children with reckless abandon.   On information and belief, the ICOC intentionally, willfully, maliciously, and recklessly knew of his proclivities without warning parents, concealed his whereabouts, and enabled his escape from authorities.

**2.    Waldo Milla-Guerra**

91.    In or about February 2018, a volunteer soccer coach named Waldo Milla-Guerra of Middlesex County, New Jersey, was arrested on charges of possession and distribution of child pornography.  Milla-Guerra volunteered at the South Brunswick Soccer Club and formerly taught at Kid's Kingdom at Central Jersey Church of Christ in North Brunswick.

**3.    Benjamin Samuel Speights**

92.    In 2005, Benjamin Samuel Speights, a member of the south region Los Angeles ICOC, was convicted for lewd and lascivious acts against a child under the age of 15.

93.    Speights' unlawful conduct included forceable participation of a 14-year-old girl to create pornographic videos that he sold.

94.     In December 2020, Speights was convicted in Arizona in connection with a Class 2 felony of sexual exploitation of a minor as part of a negotiated plea deal related to child pornography charges.  Speights was a leader in the "Kid's Kingdom" ministry in the El Segundo South Region of the Los Angeles ICOC church.  Several children at this ministry reported his physical abuse, but neither the ICOC nor its ever reported the abuse that those children endured or attempted to prevent future abuses.

**4.    Nicholas Griffin Lombardi**

95.     Nicholas Griffin Lombardi is another example of a known pedophile abusing children within the ICOC's churches. He was a long-standing member of the ICOC, as were his parents.

96.     On or about November 27, 2022, Lombardi posted on his personal Facebook page "I kind of have a fantasy of fucking a child ha[.]"

97.     Lombardi was convicted for lewd and lascivious acts against a child under the age 15. In addition, there are numerous accusations of abuse against Lombardi. And yet, the ICOC refused to report his abusive conduct to the authorities.

**5.    William (Bill) Thomas McLaughlin**

98.     In approximately August 2011, one ICOC abuser, William (Bill) Thomas McLaughlin, was sentenced to 6 years to life, followed by 10 years to life of parole for various counts of felony sexual assault on a child by a person in a position of trust.[13] He abused approximately ten to fifteen individuals, all of whom were expelled or in some fashion pushed out of the Denver ICOC as punishment for failing to comply with the leaders' commands.

**6.    Tomotaka Andrews Wilton**

99.     Tomotaka ("Tom") Andrews Wilton of the Portland, Oregon ICC location

---

[13] For more information, *see* Rhonda Moore, "Denver man sentenced in Douglas County for sex assault on child" *Castle Rock News-Press* (Aug. 16, 2011), last accessed June 13, 2023 from https://castlerocknewspress.net/stories/denver-man-sentenced-in-douglas-county-for-sex-assault-on-child,117951.

raped a child for years. [14]

100.   Church leaders, including McKean, were acutely aware of the abuse but did nothing to warn anyone regarding this despicable predator's presence.

101.   In 2009, he was convicted in Idaho of two counts of third-degree rape of a child and is now a registered sex offender. On information and belief, Wilton remains a member of the Portland ICC.

**7.     Karim Torres**

102.   Karim Torres was convicted of indecency with a child by contact.

103.   On information and belief, he is currently a registered sex offender.

104.   On information and belief, he serves as a Bible talk leader at several Texas ICOC locations. He and his wife are known to frequently visit other ICOC churches as speakers at family retreats.

**8.     Warren Inman**

105.   Warren Inman was convicted of at least three counts of indecency with a child in or about February 2021 in Denton County, Texas, Case No. F-2012-0728-D. He was a member of the Dallas ICOC and lives in Denton County.

106.   He was a worship leader and allowed college students to live in his home, as he regularly had college worship group meetings at his home. Inman has been in and out of prison and was finally arrested for child molestation. On information and belief, the ICOC neglected to report him to the police.

**9.     Joseph Ursini**

107.   Joseph Ursini has multiple arrests and has been in and out of the ICOC fellowship over the years. On information and belief, none of the Texas ICOC churches, including the Dallas location, have ever reported Ursini's criminal conduct to the relevant authorities.

---

[14] For more information, *see* the Idaho State Police offender profile, last accessed June 13, 2023 from: http://www.isp.idaho.gov/sor_id/SOR?id=35071&sz=1360; https://www.homefacts.com/offender-detail/IDSX35071/Tomotaka-Andrews-Wilton.html.

**10.    Luis Miguel Quiroz**

108.   Luis Miguel Quiroz was the subject of several individuals' reports to ICOC regarding extreme sexual abuse of several minors. However, the church did nothing.

109.   He was finally arrested approximately ten years after the reports were made to the church. Luis is the brother of Dr. Carlos Quiroz, an ICOC pediatrician.

<u>**SPECIFIC ALLEGATIONS**</u>

**A.    The Childhood Abuse of Plaintiff Bernice Perez**

110.   Bernice Perez was born in November 1991 in California.  Her mother is Desiree Perez, and her sister is Darleen Diaz.

111.   In the mid-1990s, Desiree's sister invited her to the East Region of the ICOC church.   Desiree, Bernice, and Darleen (Desiree's oldest daughter) began attending the East Region ICOC congregation located in Los Angeles County.

112.   At a very young age, Bernice was systematically and intentionally indoctrinated by the ICOC to believe the following: only members of ICOC were to be trusted; she must comply with any requests she received from adults; all medical treatment must occur within the ICOC by its members; and if she made any reports to the authorities, including Child Protective Services, her actions would result in Bernice being taken into foster care custody where she would be raped daily.

113.   From 1998 to 1999, Defendant David Saracino, a member of the ICOC, sexually abused Bernice on numerous occasions by fondling her genitals, when Bernice was about 7 to 8 years old.  This abuse occurred at Saracino's house and on at least one occasion in the backseat of a car.

114.   As a direct and proximate result of Saracino's abuse, enabled by the ICOC and its leadership, Bernice suffered and continues to suffer a litany of injuries.  Among other injuries, Bernice has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income,

1 and loss of future wages.

2 **B.      The Childhood Abuse of Plaintiff Darleen Diaz**

3      115.   Darleen Diaz was born on August 9, 1989, in California. Darleen is the
4 older sister of Bernice Diaz, mentioned above.

5      116.   At only 9 years old, Darleen was sexually abused by David Saracino.
6 From 1998 through 1999, Saracino routinely invited Darleen, her sister Bernice, and
7 other young girls to his home, which he shared with other male church members from
8 the ICOC. Saracino convinced the girls to go swimming in his pool, which was merely
9 an excuse for the girls to get undressed.  He told the girls that they needed a bath, and
10 he used that opportunity to heavily fondle their naked bodies while they were bathing.

11      117.   Similar to Bernice, Darleen was systematically and intentionally
12 indoctrinated by ICOC to believe that: only members of ICOC were to be trusted; she
13 must comply with any requests she received from adults; all medical treatment must
14 occur within the ICOC by its members; and any reports to the authorities, including
15 Child Protective Services, would result in Darleen being taken into foster care custody
16 where she would be raped daily.

17      118.   As with many children who suffered childhood sexual abuse, Darleen's
18 internal defense mechanisms repressed the abuse and as a result, discovery of the abuse
19 was delayed until Darleen reached middle school. In addition, as the eldest child,
20 Darleen wanted to be the "strong one" for her sister and took extra abuse from David
21 Saracino to protect her sister.

22      119.   One time in particular, Darleen laid on top of Bernice in the backseat of
23 the car, to try to protect her sister like a human shield, while Saracino attempted to
24 sexually assault Bernice.  Saracino nevertheless managed to take Darleen's pants off
25 and then fondle both Darleen and Bernice, penetrating their vaginas with his fingers.

26      120.   On other occasions, Saracino would forcefully perform oral sex on
27 Darleen.

28      121.   Darleen suffered in silence because she wanted her sister Bernice to

receive all of the counseling and help she needed.  She did not want to take anything away from Bernice, so she initially denied the sexual abuse.

122.   In or about 1999, Desiree's friend advised her that her son had been a victim of abuse.  That conversation prompted Desiree to then ask her own children if they had been victimized, too. When Desiree asked Bernice if she was abused, she learned that Saracino had in fact sexually abused her daughter Bernice. When Desiree approached Darleen about the same issue, Darleen herself initially denied experiencing any abuse. It was not until age 13 that Darleen told Bernice about the sexual abuse she suffered.

123.   After an incident triggered Darleen during her early teen years, Darleen felt compelled to disclose the abuse to her mother, too. Subsequently, Darleen tried to commit suicide in her early teens by trying to jump out of the car on the freeway.

124.   As a direct and proximate result of Saracino's abuse, enabled by the ICOC and its leadership, Darleen suffered and continues to suffer a litany of injuries.  Among other injuries, Darleen has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**C.     The Abuse and Anguish of Desiree Perez.**

125.   In 1995, Desiree—the mother of Bernice and Darleen—joined the ICOC and was immediately brainwashed by fellow members to believe she needed to be an ICOC member to receive eternal salvation and avert hell.

126.    Desiree was a single mother and had no support system outside of the church because of ICOC's highly exclusive and indoctrinated community.  Saracino fabricated excuses to pick up or drop off Darleen and Bernice to and from school. Saracino often preyed upon single mothers who worked full-time, as he sought to exploit their vulnerabilities by offering to transport and/or babysit their children. Because the ICOC told Desiree that she had to attend ICOC church functions three to

four times a week in order to be considered "saved," the ICOC gave Saracino the opportunity to insert himself into the lives of Desiree's daughters.  Otherwise, if she did not attend every event, the ICOC leadership would cast her out.

127.   In or about 1999, Desiree's friend confided in her that her son had been a victim of abuse.  That conversation prompted Desiree to ask her own children if they had been victimized, too. When Desiree asked Bernice if she was abused, she learned that Defendant David Saracino, a member of the ICOC, had in fact sexually abused Bernice by fondling her genitals.

128.   Upon learning of Saracino's abuse inflicted upon Bernice, Desiree immediately traveled to the East Region ICOC church in the hopes of getting answers, getting help, and exposing Saracino's abuse.  There, she met with Defendants Rob and Connie Kosberg in a room located within the church while service was being held, with Saracino in attendance.

129.   During this time, Defendants Rob and Connie Kosberg served as leaders of the East Region ICOC.  During the time that Desiree's daughters were being abused by David Saracino, Steve and Jacqueline Gansert-Morici led the East Region ICOC in Los Angeles. On information and belief, the abuse of a different 3-year-old girl by Saracino was reported to Steve and Jacqueline Gansert-Morici and other church leaders approximately eighteen months before Desiree's daughters were abused. And yet, neither Steve, nor Jacqueline Gansert-Morici, nor ICOC reported this danger to authorities.  Worse yet, Steve and Jacqueline Gansert-Morici implored other ICOC members not to report it.  As a result, they and the ICOC share culpability for Saracino's repeated and shameless sexual abuse of innocent girls.

130.   After Steve and Jacqueline Gansert-Morici left the East Region, Rob and Connie Kosberg became the new leaders.

131.   When Desiree turned to the ICOC for help regarding Saracino, she met with Rob and Connie Kosberg.  Rob and Connie told Desiree they had never heard of any other reports of that nature.  Rob and Connie stated that they did not know what to

do with the information Desiree brought to them.  Rather than contact the police, Rob and Connie Kosberg feigned helplessness to shield the church and its members from police scrutiny.

132.   Rob and Connie Kosberg repeatedly instructed Desiree to refrain from disclosing the abuse to other members because doing so would damage those members' faith, create a "struggle," and encourage them to fall away from God.  Crucially, Rob and Connie Kosberg counseled Desiree that she needed to trust Saracino, as he was her "brother" in Christ.

133.   Rob and Connie Kosberg never warned the congregation about the predator in their midst. On information and belief, they never bothered to inquire if any other children were abused by Saracino, as he was a regular Kids Kingdom worker with access to numerous children.

134.   Frustrated, Desiree went to confront Saracino at his house, but he had already fled.  He relocated to Escondido, CA, to join the San Diego chapter of the ICOC and pursue a romantic relationship with a single mother, who was part of that congregation.

135.   After filing a police report with the West Covina Police Department, Desiree kept asking Rob Kosberg for help—either to help find and apprehend Saracino, or, at the very least, to get the phone numbers for ICOC leaders in Escondido to warn them and ask for their assistance.  Rob Kosberg refused.  He stonewalled her during this crucial time, ignoring her, dismissing her, and obstructing her efforts to find Saracino.

136.   A week or so after Desiree filed the police report, West Covina detectives attempted to find him at his new San Diego address, only to discover that he had fled once again—now with the single mother and her two small children in tow, apparently to elope in Las Vegas.

137.   On information and belief, Rob Kosberg effected Saracino's transfer to the Escondido ICOC.  His refusal to engage with Desiree was done intentionally to

cover up Saracino's abuse of Bernice and Darleen, in line with the pattern of practice of concealment inherited from Steve and Jacqueline Gansert-Morici, their disciplers Bruce and Robin Williams, and ICOC leadership, *i.e.*, Kip McKean.

138.   On information and belief, Rob Kosberg and/or other Doe defendants (ICOC leaders) tipped off Saracino to flee Escondido from law enforcement's pursuit.

139.   As a direct and proximate result of Saracino's abuse, enabled by the ICOC, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, and the ICOC's leadership, Desiree's daughters Darleen and Bernice suffered and continues to suffer a litany of injuries. Among other injuries, they have experienced and will continue to experience for the rest of their lives severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

140.   Furthermore, as a direct and proximate result of Saracino's abuse and the ICOC's coverup, Desiree suffered untold emotional anguish. Word spread within the church regarding the abuse of Desiree's daughters; the congregation shunned Desiree and her daughters as a result. In a cruel twist of irony, the congregation compounded the damage Saracino already inflicted upon Desiree by treating her like a despicable outcast.

141.   Approximately five to six months after Desiree discovered the abuse, she felt extremely isolated, except for the comfort and companionship of a single ICOC "brother," Defendant Chris Del Rosario. Desiree and Chris received "permission to date" from church leadership and did so within the church's "pure dating" requirements.

142.   One fateful night, Desiree needed a ride home from work. Chris showed up at her place of work before her 12-hour shift ended, and he insisted on driving her home. Left without any other transportation options, she reluctantly agreed to accept the ride home. Chris dropped her off at home and asked to come inside to use the bathroom—on that pretense that he would not make it home in time to use his restroom.

She agreed and asked him to enter from the back door, go straight to the bathroom, and lock the back door when he left.

143.    After the couple said their goodbyes, Desiree went to her bedroom to change and get ready for bed.  All of the sudden, Chris abruptly kicked her bedroom door open.

144.    Chris was a Karate black belt.  He had also mastered other styles of martial arts, so he was physically intimidating to Desiree. When he broke through her bedroom door, he had a demonic look on his face that she had never witnessed before. He violently pushed her onto the bed, all the while Desiree screamed, "STOP IT! GET OUT!" She desperately tried to defend herself, which seemed to enrage Chris even more. She was no match for a Karate black belt.  He swiftly put her into "submission locks" using her hands and arms. He angrily told her that if she moved, her wrists would break. In sheer desperation, Desiree cried and pleaded with him to "please stop" to no avail. Chris choked her and taunted her by laughing maniacally while she begged him to stop torturing her.  Desiree eventually blacked out while Chris sadistically raped her. After Chris finished, he left Desiree in a state of complete shock.

145.    After she was raped, Desiree did not return to ICOC. She recalls hearing rumors within the congregation that she was absent from church because she was "weak and struggling." Eventually, she received a phone call from the Women's Ministry leader at the time, Kimberly Roscoe, asking her to attend a "discipleship" meeting because Chris "confessed" that they were "immoral together."

146.    Knowing that the "immoral" conduct was categorically non-consensual, Desiree reluctantly agreed to the meeting because she wanted everyone to know the truth, that Chris had raped her. To her surprise and dismay, Desiree was horrified that not only was Kimberly Roscoe's husband John in attendance, but so was Chris.

147.    Desiree bluntly told Kimberly and John that Chris raped her; however, they did not believe her.  Desiree insisted that she had been raped, which prompted Kimberly and John to begin asking her a litany of revolting and humiliating questions.

They asked her disgusting questions like: "Did you get wet? Because if you did that means you enjoyed it!" They went so far as to aggressively ask her if she had "an orgasm!?"

148.    As the sickening questions continued, Desiree ended the conversation and got up to leave.  On the way out, John Roscoe arrogantly told her that she needed to "repent" because she was "prideful."  The ICOC and its members treated women, like Desire, as second-class members, victim-shaming them and coercing them into silence by the church's repeated directive to "support and forgive the brothers."

149.  On one occasion, a female member told Desiree in a matter-of-fact manner, "it's always the woman's fault because we seduce the men to fall into sin." This particular conversation was profoundly triggering and traumatizing for Desiree in light of her own rape and the sexual abuse of her young children. These types of conversations were typical within the ICOC; they made Desiree feel worthless and insignificant.

150.    Desiree quickly realized that, although she had not personally disclosed her rape or her daughters' abuse throughout the church, numerous individuals knew what happened and did nothing but gossip about it.

151.    Since defecting from ICOC over 12 years ago, Desiree and her daughters have suffered from PTSD.  They have spent an enormous amount of time in therapy as a result of the torture they suffered.  Indeed, as a direct and proximate result of the abuse, at the hands of ICOC, and its leadership, Desiree suffered and continues to suffer a litany of injuries. Among other injuries, Desiree has experienced and will continue to experience for the rest of her life severe pain and suffering, emotional distress, humiliation, mental anguish, loss of enjoyment of life, loss of educational opportunity, loss of wages, loss of income, and loss of future wages.

**D.    The Childhood Abuse of Jane Roe 8**

152.   In 1996, when Jane Roe 8 was 3 years old and her parents were members of the East Region Los Angeles ICOC, she was molested by Saracino, who, at the

time, was a regular Kids Kingdom volunteer worker and a well-liked ICOC member.

153.   The molestation incident happened when Jane Roe 8 was in the Kids Kingdom ministry during a midweek church service. When Jane Roe 8 went home that evening, she told her mother that a man in Kids Kingdom had taken her into the closet and did things to her "butt" and that her "private parts" hurt badly. Her mother talked with Jane Roe 8 about what happened, and her mother was visibly upset and infuriated.

154.   Jane Roe 8's mother immediately called the leaders of the East Region, Steve and Jacqueline Gansert-Morici.  Steve and Jacqueline asked her to not call the police to report the molestation of her 3-year-old daughter and said they first needed advice from the overseeing Elders, Bruce and Robin Williams.

155.   By 8:30 a.m. the next day, Jane Roe 8's mother received a call from John Bringardner, a California attorney and ICOC ministry leader, who had been recently hired as General Counsel for ICOC. To Jane Roe 8's mother's complete surprise, attorney John Bringardner warned her that reporting this type of child abuse to the police or authorities would be a "huge mistake," and would further traumatize Jane Roe 8. He explained that the police might remove the child from the home while the investigation was happening, and that the child might be further molested while in foster care. He further reasoned that disclosing the child molestation to the police could cause people to lose their faith and leave God's true church. Acting as the ICOC's representative, John Bringardner manipulated Jane Roe 8's mother into silence by also telling her, if the church endured a scandal and could not "make budget" as a result, she would lose her full-time job in the ministry. The ultimate downfall of the church would be her fault.

156.   Attorney John Bringardner framed his advice to Jane Roe 8's mother as though he wanted to protect the family's best interests and shield the child from additional trauma. He also used guilt to silence Jane Roe 8's mother by making insulting statements, such as a "wise mother" would not subject her small child to a traumatic recounting of events that would inevitably occur after the authorities were

notified.

157.   Attorney John Bringardner concluded this conversation by promising to personally conduct an investigation regarding the abuse of Jane Roe 8.

158.   The ensuing events were nothing short of a nightmare. Raul Dunn, the East Region Kids Kingdom leader and a non-staff layperson, called Jane Roe 8's mother and said, "We asked the two male Kids Kingdom workers, this question: 'Did you molest a kid last night in Kids Kingdom?'" The two male workers were the only male workers the day Jane Roe 8 was molested and, of course, they denied molesting Jane Roe 8.

159.   Raul Dunn told Jane Roe 8's mother, "Your daughter was not molested, we asked the workers, and they said, no, so she must have been mistaken." Jane Roe 8's mother was furious.  When she inquired why no one was investigating her child's horrific abuse during a church service, Steve Gansert-Morici deflected and told her that he asked Raul Dunn to investigate the incident.

160.   Attorney John Bringardner called Jane Roe 8's mother often for several weeks under the pretense of calling to "check on their family to see how they were doing." In reality, he was keeping tabs on the family to ensure they never told anyone outside ICOC about Jane Roe 8's abuse at the hands of Saracino.

161.   Jane Roe 8's mother requested an opportunity for her daughter to see both men and indicate which assaulted her.  However, attorney John Bringardner refused the request and had no interest in learning which man horrifically abused the innocent child. Attorney John Bringardner said that since both brothers (*i.e.*, the two male workers) swore they did not abuse Jane Roe 8, he was not comfortable subjecting them to such treatment. Jane Roe 8's mother was upset and disappointed with the church's inaction, so she created an opportunity for Jane Roe 8 to identify which "brother" molested her. That Sunday, Jane Roe 8 and her mother stood behind a two-way mirror at the East Region Los Angeles ICOC building to try and identify her assailant, but Jane Roe 8 became so nervous and fearful that she was unable to look at both men and buried her head in her mom's torso. As a result of her crippling fear, no definitive identification

of the assailant was made, although Jane Roe 8 knew his identity at the time.

162.   Jane Roe 8's mother relayed this development to Steve and Jacqueline Gansert-Morici. Steve responded in an "I told you so" manner, and ultimately told her to forgive Saracino and move on.

163.   Attorney John Bringardner, Steve Jacqueline Gansert-Morici, and Jacqueline Gansert-Morici bullied, intimidated, and manipulated Jane Roe 8's parents, discouraging them from reporting the crime to the authorities and making them fear eternal consequences for speaking out.

164.   On information and belief, Attorney John Bringardner asked both of the male workers, David Saracino and one other member, to visit the ICOC's downtown Los Angeles headquarters office and write formal statements regarding the incidents of that fateful day. Jane Roe 8's mother was never allowed to review their statements.

165.   Five days after Jane Roe 8 was abused, her mother was at a church staff meeting in Hollywood at a church owned facility called the "Upside Down Club." After the staff meeting at the Upside-Down Club, she was called downstairs to participate in a meeting with attorney John Bringardner, Bruce and Robin Williams (ICOC Elders), and Steve and Jacqueline Gansert-Morici, to discuss the next steps in the ICOC led "investigation." The Gansert-Morici's were "discipled" by Bruce and Robin Williams, which meant the Gansert-Moricis answered to Bruce and Robin and sought their advice regarding all church related issues, including the molestation of Jane Roe 8. During the meeting, Kip McKean approached the group, isolated Jane Roe 8's mother and gave her a tight, seemingly compassionate hug. McKean stated that he was so proud of her for not going to the police, and made the statements:

> "I'm so sorry for what you're going through, but **if the police get a hold of this story, they will twist this story around and use it to destroy Gods church**. Then innocent members of our church will lose their salvation. I commend you for doing the Godly thing and allowing us

1               to handle it. On behalf of God's church, I am grateful for

2               your faith sister, and I promise you that you did the right

3               thing here!" (emphasis added)

4       166.   Approximately three weeks later, attorney John Bringardner

5 communicated to Jane Roe 8's parents that because they reported the abuse to ICOC

6 leaders, significant changes were forthcoming in Kids Kingdom. Specifically, they

7 implemented a "2 adults always" rule whereby no one person was allowed to be alone

8 with a child during Kids Kingdom. Attorney John Bringardner told Jane Roe 8's

9 mother, "Because you did not contact the police, we were able to make the Kingdom

10 of God safer."

11      167.   Jane Roe 8's mother was deeply disturbed because neither Steve nor

12 Jacqueline Gansert-Morici warned the congregation about her daughter's molestation

13 at the hands of Saracino.  Neither of them bothered to check in with the other ICOC

14 children in Kids Kingdom to determine if more abuse had occurred.

15      168.   Approximately one year after Jane Roe 8's abuse, another mother in the

16 Los Angeles East Region discovered that her child was also molested by David

17 Saracino and reported it to Steve Gansert-Morici and Rob and Connie Kosberg. Steve

18 suggested she call Jane Roe 8's mother, presumably in hopes of Jane Roe 8's mother

19 convincing the mother to refrain from reporting the abuse to the police.

20      169.   Jane Roe 8's family was utterly shocked and horrified to learn that

21 Saracino abused another child. Jane Roe 8's mother did not comply with the

22 Defendants' "advice" to further manipulate this woman, and advised the woman to

23 immediately call the police because Saracino had a history of abusing children in the

24 church.

25      170.   Because ICOC leaders refused to report David Saracino's child abuse to

26 the authorities, this deplorable predator escaped to San Diego where he abused many

27 more children until he was eventually captured in 2005 after appearing on an episode

28 of America's Most Wanted.

**E.      The Childhood Abuse of Ashley Ruiz**

171.    Plaintiff Ashley Ruiz was born in Los Angeles, California, in October 1991.  Ashley's parents were members of the East Region branch of ICOC beginning in approximately 1994.

172.    Like Bernice and Darleen, Ashley also experienced sexual abuse at the hands of David Saracino.

173.    Ashley's abuse is documented in a police report dated October 28, 2004, filed by her mother Arlene approximately 8 years after the abuse occurred. During a conversation with a family member on or about October 28, 2004, Ashley recalled the sexual assault she had repressed for many years.

174.    Saracino manipulated Ashley's mother Arlene to convince her to drop Ashley off at his residence.  He was consistently forcing himself into Arlene's life so that Saracino could gain access to Ashley.

175.    When Ashley was approximately 5 years old, Saracino would frequently pick Ashley up from school, take her to his personal residence, and then intimidate her using a consistent formula of sexual abuse.  First, Saracino would force Ashley to watch pornographic videos depicting females performing oral sex as a perverted version of a classroom scenario, where he would also consistently tell her that she needed to learn to "please her man." Afterward, Saracino would then use the pretense of allowing her to swim in the pool he had on-site. He had virtually no intention of simply "allowing" Ashley to use his swimming pool.  **Saracino would either physically undress her himself while fondling her developing body, or he would intimidate her into fully undressing and then Saracino would commonly lick her vagina**. After feigning ignorance over her lack of swimwear, David would then force her to swim naked or in her underwear while he would watch intently. After giving Ashley some time to swim, Saracino would take her inside his home, physically "bathe" her, and forcefully perform oral sex on her. Before taking Ashley home, Saracino always intimidated her into keeping quiet, including from her family, and

1  lying to her that "everything would be ok.

2

3  **FIRST CLAIM FOR RELIEF**

4  **SEXUAL ASSAULT OF A MINOR**

5  *(Against Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg,*

6  *David Saracino, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams,*

7  *Robin Williams, and Does 1 through 10)*

8  176.   Plaintiffs Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the

9  "minor Plaintiffs") re-allege and incorporate by reference herein each and every

10  allegation contained herein above as though fully set forth and brought in this cause of

11  action.

12  177.   Saracino intentionally, willfully, and maliciously sexually assaulted

13  and/or sexually abused and molested (1) Bernice during the time that Bernice was a

14  minor by fondling her naked body, (2) Darleen during the time that Darleen was a

15  minor by fondling her naked body and sexually assaulting her in the backseat of a car,

16  (3) Jane Roe 8 during the time that Jane Roe 8 was a minor by sodomizing her with his

17  hands, and (4) Ashley Ruiz during the time that Ruiz was a minor by fondling her

18  naked body and forcefully performing oral sex.

19  178.   On information and belief, in committing the unlawful acts of sexual

20  assault against Plaintiff, Saracino intended to put each minor Plaintiff in imminent

21  apprehension of harmful or offensive contact.

22  179.   Saracino put each minor Plaintiffs in imminent apprehension of such

23  harmful offensive contact as she actually believed Saracino had the ability to make

24  harmful or offensive contact with each minor Plaintiff's person.

25  180.   Each minor Plaintiff did not consent to Saracino's intended harmful or

26  offensive contact, Saracino's intention to put each minor Plaintiff in fear of imminent

27  apprehension of such contact, each minor Plaintiff was a minor during the time herein

28  alleged and, therefore, lacked the ability to consent to sexual contact with any person,

including Saracino.

181.   As a direct and legal result of this conduct, Bernice suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

182.   Saracino's conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of minor Plaintiffs, and with the substantial certainty that it would cause each minor Plaintiff to suffer humiliation, mental anguish, and emotional and physical distress.

183.   Saracino's conduct as alleged constitutes malice and oppression under California Civil Code section 3294.  Each minor Plaintiff is therefore entitled to the recovery of punitive damages in an amount to be determined by the Court.

184.   Defendants ICOC, Thomas McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Doe Defendants (the "Church Leader Defendants") are vicariously liable and liable under *respondeat superior* because each Defendant knew or should have known that Saracino was molesting children, including sexually assaulting the minor Plaintiffs, through his work at the Kids Kingdom ministry.

185.   The Church Leader Defendants are also liable insofar as they helped Saracino elude accountability and engaged in a cover up, as the term is defined pursuant to Cal. Civ. Proc. Code § 340.1(b)(2).

186.   The Church Leader Defendants are liable because they intentionally caused to exist a hierarchical cult-like structure that aided and abetted the access to children and the concealment of sexual abuse of minors, which proximately caused each minor Plaintiff's injuries at the hands of known-abuser Saracino.

## **SECOND CLAIM FOR RELIEF**

### **VIOLATION OF CAL. PENAL CODE § 647.6(a)(1)**

*(Against Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, David Saracino, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Does 1 through 10)*

187.   Plaintiffs Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the "minor Plaintiffs") re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

188.   California Penal Code § 647.6(a)(1) provides that "[every person who aims or molests any child under 18 years of age shall be punished by a fine not exceeding five thousand dollars ($5,000), by imprisonment in a county jail not exceeding one year, or by both the fine and imprisonment."

189.   As alleged herein, Saracino engaged in sexual molestation with the minor Plaintiffs while they were under eighteen years of age, in violation of California Penal Code § 647.6(a)(1).

190.    Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors, including Penal Code § 647.6(a)(1). *See Angie M. v. Superior Court*, (1995) 37 Cal.App.4th 1217, 1224-1225.

191.   Saracino's above-noted actions in molesting the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages the minor Plaintiffs have suffered and continues to suffer to this day. It also has resulted in the minor Plaintiffs incurring, and will require the minor Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

192.   Defendants ICOC, McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Doe

Defendants (herein, the "Church Leader Defendants") aided and abetted Saracino because they knew and/or should have known that Saracino was molesting the minor Plaintiffs and would continue to molest the minor Plaintiffs; the Church Leader Defendants gave him substantial assistance (*e.g.,* in the form of concealment, cover, and social or financial support); the Church Leader Defendants' support was a substantial factor in allowing Saracino to abuse the minor Plaintiffs unchecked.

193.   The above-described conduct of Saracino was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of the minor Plaintiffs, and was carried out with a conscious disregard of the minor Plaintiffs' right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling the minor Plaintiffs to punitive damages against the Defendants in an amount appropriate to punish and set an example of them.

## THIRD CLAIM FOR RELIEF

## VIOLATION OF CAL. PENAL CODE §§ 288(a), (b)(1), (b)(2)

*(Against Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, David Saracino, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Does 1 through 10)*

194.   Plaintiffs Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the "minor Plaintiffs") re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

195.   California Penal Code § 288(a) provides that a person who willfully and lewdly commits any lewd or lascivious act upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person is guilty of a felony.  California Penal Code § 288(c)(1) states that a "person who commits an act described in subdivision (a) with the intent described in that

subdivision, and the victim is a child of 14 or 15 years, and that person is at least 10 years older than the child, is guilty of a public offense."

196.   As alleged herein, Saracino engaged in lewd acts with the minor Plaintiffs while they were under eighteen years of age, including fondling their naked bodies, in order to stimulate and arouse his own sexual desires.

197.   Under California law, victims of childhood sexual abuse are entitled to bring civil actions for violations of Penal Code provisions that prohibit adults from engaging in sexual acts with minors. *See Angie M. v. Superior Court*, (1995) 37 Cal.App.4th 1217, 1224-1225.

198.   Saracino's above-noted lewd acts to the minor Plaintiffs was the proximate and legal causes of physical, psychological, emotional, and economic damages the minor Plaintiffs have suffered and continues to suffer to this day. It also has resulted in the minor Plaintiffs incurring, and will require the minor Plaintiffs to incur into the future, expenses for medical and psychological treatment, therapy, and counseling.

199.   The ICOC, McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Doe Defendants (herein, the "Church Leader Defendants") knew or should have known that Saracino commit lewd acts on the minor Plaintiffs and would continue to commit lewd acts upon the minor Plaintiffs; the Church Leader Defendants gave him substantial assistance (*e.g.,* in the form of concealment, cover, and social or financial support); the Church Leader Defendants' support was a substantial factor in allowing Saracino to conduct lewd acts on the minor Plaintiffs unchecked.

200.   The above-described conduct of Saracino was oppressive, malicious and despicable in that it was intentional and done in conscious disregard for the rights and safety of the minor Plaintiffs, and was carried out with a conscious disregard of the minor Plaintiffs' right to be free from such tortious behavior, such as to constitute oppression, fraud or malice pursuant to California Civil Code section 3294, entitling

the minor Plaintiffs to punitive damages against Saracino and the Church Leader
Defendants in an amount appropriate to punish and set an example of them.

## FOURTH CLAIM FOR RELIEF

### SEXUAL ASSAULT

*(Against Defendant Chris Del Rosario, the ICOC, Thomas "Kip" McKean, Rob
Kosberg, Connie Kosberg, and Does 1-10)*

201.   Plaintiff Desiree Perez re-alleges and incorporates by reference herein
each and every allegation contained herein above as though fully set forth and brought
in this cause of action.

202.   As used in Cal. Civ. Proc. Code § 340.16, "sexual assault" means any of
the crimes described in Section 243.4, 261, 264.1, 286, 287, or 289, or former
Sections 262 and 288a, of the Penal Code, assault with the intent to commit any of
those crimes, or an attempt to commit any of those crime. Cal. Civ. Proc. Code §
340.16(b)(1).

203.   Del Rosario intentionally, willfully, and maliciously sexually battered
Desiree in violation of California Penal Code § 234.4(a) by holding Desiree down and
restraining her while touching her for the purpose of his own sexual arousal and
gratification.

204.   In committing the unlawful acts of sexual battery and assault against
Desiree, Del Rosario intended to put her in imminent apprehension of harmful or
offensive contact before proceeding to engage in harmful contact of Desiree's
intimate parts.

205.   Del Rosario put Desiree in imminent apprehension of such harmful
offensive contact as Desiree actually believed he had the ability to make harmful or
offensive contact with her person.

206.   Desiree did not consent to Del Rosario's harmful and offensive contact.

207.   As a direct and legal result of this conduct, Desiree suffered harm
including, but not limited to: physical, mental, and emotional injuries related to sexual

abuse; medical and other expenses for care, treatment, and counseling, and Desiree will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

208.    Del Rosario's conduct was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Desiree, and with the substantial certainty that it would cause Desiree, to suffer humiliation, mental anguish, and emotional and physical distress.  His conduct therefore as alleged constitutes malice and oppression under California Civil Code section 3294. Desiree is, therefore, entitled to the recovery of punitive damages, in an amount to be determined by the Court.

209.    Furthermore, the ICOC, led by McKean and other Defendant church leaders, directly inserted themselves into Desiree's dating life and the dating pool in general, not only by holding the ICOC out as a trustworthy source to screen candidates for its members, but also controlling its members, like Desiree, to date only within the ICOC and its approved list.

210.    Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, and Does 1-10 (herein, the "Church Leader Defendants") negligently screened Del Rosario as an appropriate candidate and negligently represented that it had done, as it knew or should have known that Del Rosario was dangerous.  By endorsing Del Rosario, the Church Leader Defendants gave Del Rosario the ICOC's imprimatur, thereby inducing Desiree to lower her guard and misplace her trust in Del Rosario.  As a result, the Church Leader Defendants' individual and collective negligence is a legal and proximate cause of the damages Desiree suffered at the hands of Del Rosario.

## FIFTH CLAIM FOR RELIEF

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

*(Against Saracino, Del Rosario, and Does 1-10)*

211.    Plaintiffs re-allege and incorporate by reference herein each and every

allegation contained herein above as though fully set forth and brought in this cause of action.

212. The conduct of all Defendants as set forth in this Complaint was extreme and outrageous, and committed with the intention of causing, or reckless disregard of the probability of causing, emotional distress.

213. A reasonable person would not expect or tolerate the sexual assault committed by Saracino and Del Rosario.

214. A reasonable person would not expect, accept, or tolerate Saracino's and Del Rosario's unlawful sexual assault and/or sexual abuse, and molestation of Plaintiffs.

215. Saracino's and Del Rosario's respective conduct exceeded all bounds of that usually tolerated in a civilized community.

216. Saracino and Del Rosario intended to cause Plaintiffs injury when they sexually assaulted Plaintiffs.

217. Plaintiffs have suffered severe and/or extreme distress as a result.

218. As a direct and legal result of Saracino's and Del Rosario's conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

219. Saracino's and Del Rosario's conduct described herein was oppressive, malicious, and despicable in that it was intentional and done in conscious disregard for the rights and safety rights of Plaintiffs, and with the substantial certainty that it would cause Plaintiffs, to suffer humiliation, mental anguish and emotional and physical distress.

220. Defendants' conduct as alleged constitutes malice and oppression under California Civil Code section 3294. Plaintiffs are, therefore, entitled to the recovery of

punitive damages, in an amount to be determined by the Court.

## SIXTH CLAIM FOR RELIEF

## SEXUAL BATTERY IN VIOLATION OF CAL. CIV. CODE § 1708.5

*(Against All Defendants and Does 1-10)*

221.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

222.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 1708.5, which prohibits sexual battery.

223.   The minor Plaintiffs bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.  Plaintiff Desiree brings this claim pursuant to Section 340.16(e)(1), which revives "any claim seeking to recover damages suffered as a result of a sexual assault that occurred on or after the plaintiff's 18th birthday that would otherwise be barred before January 1, 2023, solely because the applicable statute of limitations has or had expired, is hereby revived, and a cause of action may proceed if already pending in court on January 1, 2023, or, if not filed by that date, may be commenced between January 1, 2023, and December 31, 2023."

224.   As alleged herein, Plaintiffs are each the victims of sexual battery, perpetrated by Saracino or Del Rosario.

225.   Cal. Civ. Code § 1708.5 prohibits any act with the intent to cause a harmful or offensive contact with an intimate part of another, and a sexually offensive contact with the person results, or any act that causes an imminent apprehension of such harmful or offensive contact and the offensive contact results.

226.   Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie

Kosberg, David Saracino, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams (collectively, the "Church Leader Defendants") knowingly conspired with Saracino and Del Rosario, and/or aided and abetted them in their sexual battery, to allow or force Plaintiffs into sexual battery with Saracino and Del Rosario, and such sexual battery did, on multiple occasions, occur.

227.    Plaintiffs Bernice, Darleen, Ashley, and Jane Roe 8 were minors when Saracino sexually battered them.

228.    The Church Leader Defendants, individually and collectively, knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregious, offensive sexual contact with Saracino and Del Rosario, all in furtherance of sexually battering Plaintiffs and in furtherance of their Abuse Enterprise.  Specifically, they helped create the conditions for sexual battery to thrive and then go unchecked and unaccounted for by concealing the abuse, failing to report the abuse, pair up abusers with their victims (the Plaintiffs), and then conceal the abuse after the fact, which itself sent a message of endorsement to continue more abuse.

229.    The sexual battery of Plaintiffs by Saracino and Del Rosario was the result of the Church Defendants' cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

230.    As a direct and proximate cause of each of the Defendants' actions, individually and collectively, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

231.    The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

232.    Plaintiffs are therefore entitled to recover treble the amount of damages

they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees, and other relief that the Court may deem proper.

## SEVENTH CLAIM FOR RELIEF

## GENDER VIOLENCE IN VIOLATION OF CAL. CIV. CODE § 52.4

*(Against All Defendants and Does 1-10)*

233.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

234.   Plaintiffs bring this claim for relief under Cal. Civ. Code Section 52.4, which prohibits acts of gender violence.

235.   Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the "minor Plaintiffs") bring this claim pursuant to California Assembly Bill 218, amending Sections 340.1 and 1002 of the California Code of Civil Procedure and Section 905 of the Government Code, relating to childhood sexual assault, reviving until December 31, 2023 the statute of limitations for all previously extinguished claims for damages suffered as a result of childhood sexual assault for victims within 22 years of the age of majority.  Plaintiff Desiree brings this claim pursuant to Section 340.16(e)(1), which revives "any claim seeking to recover damages suffered as a result of a sexual assault that occurred on or after the plaintiff's 18th birthday that would otherwise be barred before January 1, 2023, solely because the applicable statute of limitations has or had expired, is hereby revived, and a cause of action may proceed if already pending in court on January 1, 2023, or, if not filed by that date, may be commenced between January 1, 2023, and December 31, 2023."

236.   As alleged herein, Plaintiffs were the victims of multiple instances of sexual battery as a minor perpetrated by Saracino and Del Rosario and facilitated by the Church Leader Defendants, as listed herein.  The Church Leader Defendants subjected Plaintiffs to these multiple incidents of gender violence at the hands of

Saracino and Del Rosario, including while the minor Plaintiffs were under the age of 18.

237.   Cal. Civ. Code § 52.4 prohibits commission of acts of gender violence, defined to include a physical intrusion or physical invasion of a sexual nature under coercive conditions, whether or not those acts have resulted in criminal complaints, charges, prosecution, or conviction.

238.   As alleged herein, Plaintiffs were repeatedly the victim of acts of gender violence by Saracino and Del Rosario, for instance, from their acts of fondling their genitalia, anus, and/or raping the Plaintiffs.

239.   Each Church Leader Defendant herein knowingly conspired and/or aided and abetted to create conditions of coercion and control that caused Plaintiffs to be repeatedly subjected to private, egregiously offensive sexual contact with Saracino and Del Rosario, all in furtherance of committing acts of gender violence against Plaintiffs.

240.   The repeated sexual battery of Plaintiffs by Saracino and Del Rosario was the result of the Church Leader Defendants' collective cover up, as statutorily defined by California Code of Civil Procedure § 340.1(b).

241.   As a direct and proximate cause of each of the Defendants' collective and individual actions, Plaintiffs have suffered severe emotional and mental distress and anxiety, humiliation, embarrassment, and additional damages.

242.   The aforementioned conduct was willful, wanton, and malicious.  At all relevant times, Defendants acted with conscious disregard of Plaintiffs' rights and safety as a minor in their care.  Defendants also acted with the knowledge of or with reckless disregard for the fact that their conduct was certain to cause injury and/or humiliation to Plaintiffs.

Plaintiffs are therefore entitled to recover treble the amount of damages they sustained, pursuant to California Code of Civil Procedure § 340.1(b)(1) in an amount to be proven at trial, attorneys' fees and other relief that the Court may deem proper

# EIGHTH CLAIM FOR RELIEF

## NEGLIGENT HIRING, SUPERVISION, AND RETENTION

*(Against Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Does 1-10)*

243.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

244.   At all times relevant, a special relationship existed between Defendants listed herein to this cause of action (the "Church Leader Defendants") and Saracino and Del Rosario, respectively, because Saracino and Del Rosario were the agents of the Church Leader Defendants, each of whom had the ability to control of Saracino's and Del Rosario's conduct, yet failed to exert it.  In doing so, the Church Leader Defendants created a widespread culture of acceptance of the abuse of children, as the Church Leader Defendants collectively brainwashed and manipulated the Plaintiffs to remain silent about the abuse.  Those Church Leader Defendants also actively concealed the abuse to avert discovery by the authorities and the community at large.

245.   At all times herein, each Church Leader Defendant negligently supervised, managed, and controlled Saracino and Del Rosario in their membership and participation in the ICOC, and negligently failed to warn Plaintiffs, Plaintiffs' parents, and other members of the ICOC church, of the propensity and risk that Saracino and Del Rosario would sexually assault, sexually abuse, and/or molest adults and minor children, a propensity and history of which  Church Leader Defendants, and each of them, acting through their employees, agents, and volunteers, had actual notice.

246.   During the same time period, each Church Leader Defendant was negligent in failing to exercise reasonable care to protect Plaintiffs, and other minors, who were members of, or participants in, activities at the Church Leader Defendants' church, from the risk of sexual assault, sexual abuse, and molestation by perpetrators,

including Saracino and Del Rosario.

247. In the case of Saracino, the Church Leader Defendants were negligent in failing to exercise reasonable care on the premises of ICOC church property.

248. The Church Leader Defendants were further negligent in failing to notify law enforcement and other appropriate authority that Plaintiffs were and/or continued to be a victim of child abuse/assault or sexual assault and battery by Saracino and Del Rosario when they learned of this fact. The Church Leader Defendants' failed report the known and/or reasonably suspected child abuse and sexual assault of Plaintiffs. Instead, the Church Leader Defendants perpetuated and facilitated Saracino's and Del Rosario's continued sexual abuse, sexual assault, and molestation of Plaintiffs and others.

249. Had the Church Leader Defendants satisfied their duty to take reasonable steps to protect Plaintiffs, including the Plaintiffs who were minor children, from known and/or foreseeable harm, including sexual assault, including reporting the sexual assault and/or sexual abuse, and molestation to law enforcement, then some or all of the Plaintiffs' injuries would have been avoided.

250. Prior to, during, and after the sexual assault of Plaintiffs, the Church Leader Defendants, through their administrators, employees, agents, and/or volunteers, had knowledge, and/or were otherwise on notice, that Saracino and Del Rosario had and/or was engaged in, and/or presented the risk of, sexual assault of Plaintiffs, and other minors.

251. Plaintiffs are informed, believe, and thereupon allege that prior to, and during Saracino's and Del Rosario's sexual assault and/or sexual abuse, and molestation of Plaintiffs, the Church Leader Defendants knew or should have known, reasonably suspected, and/or were otherwise on notice, of the Defendants' unlawful conduct, as set forth in this Complaint, but failed and/or refused to take any affirmative action, including but not limited to notifying law enforcement. Instead, the Church Leader Defendants directed Plaintiffs and Plaintiffs' parents to continue to have contact

with Saracino and Del Rosario, thereby ratifying and facilitating their continued sexual assault and/or sexual abuse and molestation of Plaintiffs.

252.    The Church Leader Defendants breached their duties by failing to use reasonable care to protect Plaintiffs from their disciples, employees, and/or agents, namely, Saracino and Del Rosario.

253.    Had the Church Leader Defendants fulfilled their duties and responsibilities, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against them and the resulting harm.

254.    As a direct and legal result of the all of the Defendants' conduct, Plaintiffs suffered harm including, but not limited to, physical, mental, and emotional injuries of childhood sexual abuse and molestation; was caused to incur medical and other expenses for care, treatment, and counseling, and Plaintiffs will continue to incur all such damages in the future, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

255.    Plaintiffs are informed, believes, and thereupon alleges that the Church Leader Defendants' failure to respond, investigate, terminate the Defendants' employment, report, or take any other action following Plaintiffs, other minor children, and Plaintiffs parents' report of sexual assault and/or abuse by the Church Leader Defendants was part of the Church Leader Defendants' concerted effort to cover up and/or hide evidence related to childhood sexual assault of minor children, including Plaintiffs.

256.    Plaintiffs' damages as a result of Saracino's and Del Rosario's sexual assault, abuse, and molestation of Plaintiffs was a direct result of the Church Leader Defendants' concealment and cover-up. As such, Plaintiffs are entitled to treble damages against the Defendants pursuant to Code of Civil Procedure section 340.1(b)(2).

/ / /

/ / /

## NINTH CLAIM FOR RELIEF

### NEGLIGENT SUPERVISION OF A MINOR

*(Against Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams, and Does 1-10)*

257.   Plaintiffs Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the "minor Plaintiffs") re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

258.   Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, and Robin Williams (the "Church Leader Defendants") were responsible for the care, custody, control, supervision, and protection of the minor children entrusted to them, including Plaintiffs.  The Church Leader Defendants had a duty to adequately and properly supervise, monitor, and protect Plaintiffs from known and knowable dangers, such as those posed by Saracino.

259.   Each Church Leader Defendant breached their duty to properly and adequately supervise, monitor, and protect Plaintiffs, in part because the officers, administrators, agents, and other supervisory employees knew or should have known of Saracino's improper behavior, including that the fact that minor children (like the minor Plaintiffs) were frequently alone with Saracino without any justification, that Saracino would frequently touch and sexually abuse minor children, including the minor Plaintiffs, at Church Leader Defendants' premises without any justifiable reason for doing so, including when the minor children were by themselves, and that Saracino sexually abused, assaulted, and/or molested minor children, including but not limited to the minor Plaintiffs.

260.   The Church Leader Defendants, acting through their administrative and supervisory employees, knew or should have known that the minor Plaintiffs were

unattended and unsupervised with Saracino on numerous occasions, without any justification. It should have been obvious to any officer, agent, administrator, employee, or staff member that there was no reason that neither the minor Plaintiffs, nor any other child, should have been alone with Saracino. The Church Leader Defendants and their employees and agents instead turned a blind eye to the fact that Saracino was spending time with minor children, including the minor Plaintiffs, unattended and unsupervised without any investigation into the matter.

261. After engaging in grooming activity of the minor Plaintiffs while spending time alone with the minor Plaintiffs, Saracino started sexually assaulting, sexually abusing, and molesting the minor Plaintiffs and other minor children on the Church Leader Defendants' premises and during church related services. The acts of sexual assaults and abuse occurred while the minor Plaintiffs were left unattended and unsupervised.

262. If each of the Church Leader Defendants adequately and properly supervised, monitored, and protected the minor Plaintiffs, the minor Plaintiffs would not have been harmed, or would not have been harmed to the extent that Plaintiffs were.

263. Each of the Church Leader Defendants also recklessly and negligently failed to implement and/or enforce policies and procedures that were aimed at preventing or detecting sexual assault and assault of their minor members.

264. Had each of the Church Leader Defendants adequately performed their duties and responsibilities, then Plaintiffs would not have been subject to the sexual assault, assault and harassment perpetrated by Saracino.

265. The minor Plaintiffs have been severely damaged emotionally and physically, and otherwise, in amounts to be proven at the time of trial, as a direct and legal result of the acts and omissions of the Church Leader Defendants, and each of them.

/ / /

/ / /

FIRST AMENDED COMPLAINT

**<u>TENTH CLAIM FOR RELIEF</u>**

**FAILURE TO REPORT SUSPECTED CHILD ABUSE IN VIOLATION OF PENAL CODE §§ 11165 ET SEQ. BASED ON VICARIOUS LIABILITY**

*(Against Defendants Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams and Does 1-10)*

266.    Plaintiffs Darleen Diaz, Bernice Perez, Jane Roe 8, and Ashley Ruiz (the "minor Plaintiffs") re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

267.    Defendants Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams and Does 1-10 (herein, the "Individual Church Leader Defendants"), through their administrators and employees knew or reasonably suspected that Saracino had, and or was, engaged in the sexual assault of children while the children were under the care, custody, and supervision of the Church Leader Defendants, and each of them, and thus had a duty to report Saracino to the appropriate authorities under the California Child Abuse and Neglect Reporting Law. *See* Penal Code §§ 11164-11174.3 ("CANRA").

268.    At all times relevant herein and material hereto, the Individual Church Leader Defendants were agents, directors, or employees of Defendant ICOC and other Individual Church Leader Defendants.  The Individual Church Leader Defendants were responsible for hiring, training, supervising, and retaining each other as part of their church and youth bible studies program.  The ICOC's and the Individual Church Leader Defendants' staff, employees, and administrators were required to report any suspected child or sexual abuse as part of their duties and responsibilities as employees and/or agents of  the ICOC and Church Leader Defendants.

269.    On information and belief, the Individual Church Leader Defendants and

the ICOC's administrators, board members, and employees are mandated reporters under Penal Code section 11165.7.

270.   Penal Code section 11166(a) states that a mandated reporter shall make a report to an agency whenever he/she, in his/her professional capacity or within the scope of his/her employment, has knowledge of or observes a child whom the mandated reporter knows, or reasonably suspects has been a victim of child abuse or neglect. "Reasonable suspicion" does not require certainty that child abuse or neglect has occurred but looks to if it is objectively reasonable for a person to entertain a suspicion to suspect child abuse or neglect. (Penal Code § 11 lr66(a)(l).)

271.   As set forth in this Complaint, the Individual Church Leader Defendants, through their administrators, board members, and employees knew and/or reasonably suspected that children had been sexually assaulted by Saracino and others, prior to Saracino's sexual assault of the minor Plaintiffs, giving rise to a duty to report such conduct under CANRA.

272.   The ICOC, through its administrators, board members, and employees, including but not limited to the Individual Church Leader Defendants, knew that in the absence of the exercise of reasonable diligence, that an undue risk to minors, including the minor Plaintiffs, existed because the Individual Church Leader Defendants' administrators, board members, and/or employees did not comply with California's mandatory reporting requirements.

273.   The ICOC, through its administrators, board members, and employees, including but not limited to the Individual Church Leader Defendants, failed to report the known and/or reasonably suspected child molestations and assaults, created the risk and danger contemplated by CANRA, and a result, unreasonably and wrongfully exposed the minor Plaintiffs and other minors to sexual molestation and abuse.

274.   If the ICOC, through its administrators, board members, and employees, including but not limited to the Individual Church Leader Defendants, complied with CANRA's mandatory reporting requirements, then the minor Plaintiffs would not have

been harmed at all or to the extent that they were.

275.   As a direct result of the Individual Church Leader Defendants' failure to comply with CANRA's mandatory reporting requirements, through their administrators, board members, and employees, the Individual Church Leader Defendants wrongfully denied the minor Plaintiffs the intervention of child protection services and constituted a *per se* breach of  their duties to the minor Plaintiffs.

276.   As a direct and legal result of the Individual Church Leader Defendants' conduct, the minor Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

## ELEVENTH CLAIM FOR RELIEF

### NEGLIGENCE

*(Against All Defendants and Does 1-10)*

277.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

278.    Defendants owed a duty of care to the minor Plaintiffs or had a duty to control the conduct of Saracino by way of the special relationship existing between those individuals and Plaintiffs.  Defendants also owed a duty of care to Desiree and had a duty to warn about the conduct of Del Rosario by way of the special relationship existing between Desiree and the ICOC regarding who they had "permission" to date.

279.  Defendants ICOC, Thomas "Kip" McKean, Rob Kosberg, Connie Kosberg, Steve Gansert-Morici, Jacqueline Gansert-Morici, Bruce Williams, Robin Williams and Does 1-10 (herein, the "Church Leader Defendants") knew, or should have known, reasonably suspected, and/or were otherwise on notice, of the misconduct and sexually predatory behavior of Saracino and Del Rosario, especially directed

towards minor children in the case of Saracino.

280.   Despite having knowledge of the misconduct of Saracino and Del Rosario, all Defendants herein failed to take any preventative action to control, curb, and/or prevent that conduct, failed to warn Plaintiffs or Plaintiffs' parents of that wrongful conduct, and/or failed to notify law enforcement, despite having a legal duty to do so.

281.   As a direct and legal result of Defendants' negligence, Plaintiffs were sexually assaulted, sexually abused, sexually harassed, and assaulted by Saracino or Del Rosario.

282.   Had the Church Leader Defendants fulfilled their duty and responsibility, then Plaintiffs would not have been subject to all or most of the misconduct perpetrated against them and the resulting harm.

283.   As a direct and legal result of Defendants' respective acts, omissions, and conduct, Plaintiffs suffered severe and permanent injuries including, but not limited to, physical and mental pain and suffering, severe emotional distress, physical injuries, past and-future costs of medical care and treatment, and other damages, in an amount not yet ascertained, but which exceed the minimum jurisdictional limits of this Court.

284.   Furthermore, the negligence of the Church Leader Defendants was a substantial factor in causing each Plaintiff's severe emotional distress, which includes their suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame from being sexually assaulted, sexually battered, and then being gossiped about, ostracized, and humiliated by the ICOC, the Church Leader Defendants, and the ICOC community at large. Each Church Leader Defendant intentionally took further actions to silence Plaintiffs and isolate them, thereby knowingly and recklessly exacerbating the emotional distress that Saracino and Del Rosario already inflicted as a result of their abuse.

/ / /

/ / /

**TWELFTH CLAIM FOR RELIEF**

**VIOLATION OF FEDERAL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ("RICO") ACT 18 U.S.C. § 1962(c)**

*(Against All Defendants and Does 1-10)*

285.   Plaintiffs re-allege and incorporate by reference herein each and every allegation contained herein above as though fully set forth and brought in this cause of action.

286.   Plaintiffs bring this claim for relief under the private cause of action provided by 18 U.S.C. § 1984(c), which prohibits violations of the Federal RICO Act insofar as such violation injures any person in his business or property.  On information and belief, Plaintiffs were forced to tithe, relinquishing their income or providing uncompensated labor on behalf of the ICOC.

287.   Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

288.   The Abuse Enterprise, distinct from Defendants, is an association-in-fact within the meaning of 18 U.S.C. § 1961(4), organized within individual ministries, funneling into regions governed by individual elders and church leaders, and headquartered in Los Angeles, California.  Members of the Abuse Enterprise maintain a common purpose of extracting money from its members and perpetrating sexual abuse upon minor children under the auspices of liturgical praxis and writings taught by its church ministers worldwide. The Abuse Enterprise began as early as 1979 and continues with a growing global membership of more than 120,000 today. Concealment of sexual abuse and molestation became inextricably linked to the Abuse Enterprise to bring in more members as well as to retain others and maintain their vice grip on their tithing and financing.

289.   Defendants have conducted and participated in the affairs of the Abuse Enterprise through a pattern of racketeering activity within the meaning of 18

U.S.C. §§ 1961(1) and 1961(5).

290.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts: sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260.

291.   Each Defendant, in their individual capacity, knew or should have known about the majority of the predicate acts carried out by Defendants within the Abuse Enterprise.

292.   Upon information and belief, some combination of Defendants have engaged in an uninterrupted course of unlawful conduct consisting of all of the herein described predicate acts.

293.   Defendants' pattern of racketeering activity includes, but is not limited to, many repeated occurrences of the following predicate acts:  (i) violating the prohibition against human trafficking under 18 U.S.C. § 1590; (ii) laundering of monetary instruments outside of the United States with the intent to promote the carrying on of unlawful activity in violation of 18 U.S.C. §1956(a)(2); and (iii) sexual exploitation of minors and the transmission of visual depictions of minors engaged in sexually explicit conduct in violation of 18 U.S.C. §§ 2251, 2252, and 2260 Upon information and belief, several hundred children have been sexually exploited as a result of this pattern of racketeering behavior.

294.   Upon information and belief, hundreds of individuals within Defendants' inner circles have been extorted through fear of financial and physical injury into making large financial payments to Defendants and into providing sexual services to Defendants as a result of this pattern of racketeering behavior.

295.   Upon information and belief, many millions of dollars have been trafficked out of the United States for the purposes of carrying on unlawful activity as a result of this pattern of racketeering behavior.

296.   Upon information and belief, Defendants' pattern of racketeering

behavior has been related and continuous since its inception.  Upon information and belief, there is not only a threat of continued criminal activity, but continued criminal activity is occurring within the Abuse Enterprise at the hands of nearly all Defendants as of the writing of this Complaint.

297.   Defendants and the Abuse Enterprise regularly move goods, money, and people across state lines, and are therefore engaged in interstate commerce.

298.   As a direct and proximate result of these patterns of racketeering behaviors, Plaintiffs has sustained damages, including lost wages, loss of economic opportunity, loss of educational opportunity, loss of future income, loss of specific extorted payments, physical injury, severe emotional distress, and additional economic losses.

299.   Plaintiffs are therefore entitled to recover treble the damages they sustained in an amount to be proven at trial, the cost of the suit, plus a reasonable attorney's fee, pursuant to 18 U.S.C. § 1964(c).

## **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs respectfully pray for relief as follows:

(a)   Compensatory and special damages in an amount to be proven at trial;

(b)   Statutory penalties and liquidated damages according to proof at time of trial;

(c)   Punitive and exemplary damages in an amount according to proof at the time of trial;

(d)   Treble damages;

(e)   Pre- and post- judgment interest;

(f)   Reasonable attorney's fees and costs; and

(g)   Such other and further relief as the Court deems just and proper.

Plaintiffs respectfully demand a trial by jury on all claims so triable.

**SAMINI BARIC KATZ LLP**

Date: June 16, 2023                    By:    /s/ Bobby Samini

                                              Bobby Samini, Esq.
                                              Michael Katz , Esq.
                                              Steve Baric, Esq.
                                              John S. Oney, IV, Esq.
                                              Attorneys for Plaintiffs
                                              Darleen Diaz, Bernice Perez, Desiree, Jane
                                              Roe 8, and Ashley Ruiz

**PROOF OF SERVICE**

STATE OF CALIFORNIA)
COUNTY OF ORANGE)

I am employed in Orange County.  My business address is 650 Town Center Drive, Suite 1500, Costa Mesa, CA 92626, where this mailing occurred.  I am over the age of 18 years and am not a party to this cause.  I am readily familiar with the practices of SAMINI BARIC KATZ LLP for collection and processing of correspondence for mailing with the United States Postal Service.

On June 16, 2023, I served the foregoing documents on the interested parties in this action entitled as follows:

**FIRST AMENDED COMPLAINT**

**SEE ATTACHED SERVICE LIST**

[]    (**BY MAIL**) I placed such envelope for collection and mailing on this date following ordinary business practices.

**[XX] (BY THE COURT'S ECF SYSTEM)**:  I caused each such document(s) to be transmitted electronically by posting such document electronically to the ECF website of the United States District Court for the Central District of California, on all ECF-registered parties in the action.

**[] (BY THE COURT'S ECF SYSTEM)**:  I caused each such document(s) to be transmitted electronically by posting such document electronically to the ECF website of the United States District Court for the Central District of California, on all ECF-registered parties in the action.

[]     (**BY EMAIL**) On June 16, 2023, I caused the above-referenced document(s) to be sent in electronic PDF format as an attachment to an email addressed to the person(s) on whom such document(s) is/are to be served at the email address(es) shown above, as last given by that person(s) or as obtained from an internet website(s) relating to such person(s), and I did no receive an email response upon sending such email indicating that such email was not delivered.

[XX] (**FEDERAL**) I declare that I am employed in the office of a member of the bar of this court at whose direction the services was made.

Executed on June 16, 2023, at Costa Mesa, California.

*/s/ Griselda Alfaro*_____

Case No.

1

## SERVICE LIST

2

3  Andrew J. Waxler, Esq.
   John T. Lupton, Esq.
4  Madeleina Halley, Esq.
   Tad A. Devlin
5  KAUFMAN DOLOWICH &
6  VOLUCK, LLP
   21515 Hawthorne Blvd., Suite 450
7  Torrance, CA 90503
   Telephone: 310-525-9720
8  Fax: 805-388-3414
9  awaxler@kdvlaw.com
   jlupton@kdvlaw.com
10 mhalley@kdvlaw.com
   tdevlin@kdv.com
11

*Attorneys for Defendant, HOPE WORLDWIDE, LTD.*

12 Mindee J Stekkinger
13 Molly M. Loy
   Thomas E. Beach
14 BEACH LAW GROUP LLP
15 500 East Esplanade Drive, Suite 1400
   Oxnard, CA 93036
16 Telephone: 805-388-3100
   Fax: 805-388-3414
17 mail@beachlawgroup.com
18 molly@beachcowdrey.com

*Attorneys for Defendant, CITY OF ANGELS INTERNATIONAL CHRISTIAN CHURCH,* THE INTERNATIONAL CHRISTIAN CHURCH, INC., and MERCYWORLDWIDE

19

20

21

22

23

24

25

26

27

28